James **HEDGEPATH**, Appellant

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

**No. 2013–SC–00343–MR.**

Supreme Court of Kentucky.

Sept. 18, 2014.

Brandon Neil Jewell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Jeanne Deborah Anderson, Assistant Attorney General, Office of the Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant, James Hedgepath, was convicted of the murder and repeated sexual

assault of his girlfriend. On appeal, he claims the trial court erred by refusing to suppress evidence against him, by refusing to sever some of his charges, and by excluding recorded statements of the victim's minor children, who could not be found to testify at trial. Finding no error, this Court affirms.

## I. Background

On January 17, 2010, around 10:00 a.m., Hedgepath called 911 and reported that his girlfriend, Mary Reyes, would not wake up. When emergency medical services and police arrived, they found Reyes unconscious, and she was airlifted to the hospital.

The medical staff at the hospital discovered that Reyes had suffered blunt-force trauma to her head that caused a subdural hematoma, respiratory failure caused by lung contusions, fractured ribs, a lacerated spleen, a lacerated liver, and severe bruising all over her body. These findings indicated that Reyes had been severely beaten. She was placed on life-support and eventually died from her injuries.

Meanwhile, Hedgepath told police at the scene that an ex-boyfriend of Reyes had come over when he was not home and had beaten her. Soon after talking to police, Hedgepath left the apartment with Reyes's two young children, supposedly to go to the hospital. But they never arrived at the hospital. It was later discovered that instead of going to the hospital, he took the children to Reyes's mother, Mary Powell, who then took them to their father, Felipe Reyes.

Kentucky State Police Detective Bryan Whittaker went to the hospital to meet Hedgepath for an interview. Detective Whittaker was concerned when Hedgepath did not arrive, in part because he knew that Reyes's children were with Hedgepath and he was suspicious about Hedgepath's involvement in the assault on Reyes. He tried to call Hedgepath on his cell phone, but Hedgepath did not answer. He then contacted AT & T to "ping" Hedgepath's cell phone and find its location. The next morning, January 18, he learned that Hedgepath's cell phone was at a specific apartment complex. He went to the complex and found Hedgepath's vehicle (a Nissan Pathfinder SUV). At that time, Hedgepath called the Kentucky State Police, and the call was patched through to Detective Whittaker, who asked Hedgepath to go to the Kentucky State Police Post in Henderson, Kentucky. Hedgepath did so, driving there in his own vehicle.

Hedgepath was interrogated by Detective Whittaker. He denied any involvement in Reyes's assault, saying repeatedly that he was not at the apartment when Reyes was beaten, that his cell phone could confirm this (presumably referring to call records on the phone), and that the police should check his phone to confirm his story. He claimed that when he arrived at the apartment the night before Reyes was taken to the hospital, she told him that a man named "Bobby" had beaten her but that "everything was cool." He claimed that he and Reyes had a meal together and then engaged in consensual anal, vaginal, and oral sex. He claimed not to have noticed anything unusual, despite extensive bruising on Reyes's buttocks, though he said he saw a bruise on her toe (two of her toes were apparently broken in the assault). Hedgepath was arrested at the end of the interrogation.

As part of the subsequent investigation, discussed in more detail below, police seized Hedgepath's cell phone from his vehicle. The SIM card was missing from

the phone.[1] On the phone, police found ten highly incriminating videos that had been made on January 15, 2010. Though copies of the videos do not appear to have been included in the appellate record, according to the Commonwealth's brief and filings with the trial court, the videos depicted Hedgepath sexually assaulting Reyes (with his penis, mouth, and a bottle), verbally abusing her, lifting her by her nipples, and slapping her on multiple occasions. According to those documents, in several of the videos, Reyes can be heard asking Hedgepath to stop, saying that "it hurts," and asking him not to put the bottle in her.

Hedgepath was indicted on two counts of first-degree rape and two counts of first-degree sodomy, all occurring on January 15, 2010, based on the videos from his phone. He was also indicted for first-degree rape with serious physical injury, first-degree sodomy with serious physical injury, and first-degree sodomy based on his admissions in his interrogation by Detective Whittaker to having had sexual contact with Reyes on January 16, 2010. He was also indicted for murder, tampering with physical evidence, and being a first-degree persistent felony offender.

He moved multiple times to suppress evidence, primarily that found on his phone, and each time the trial court denied the motion. He eventually entered a plea of guilty to murder under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), conditioned on his being able to appeal the issues raised in this case. The other charges were dismissed under the plea agreement. Hedgepath was sentenced to fifty years in prison.

Hedgepath now appeals to this Court as a matter of right, *see* Ky. Const. § 110(2)(b), as allowed by his conditional guilty plea. Additional facts will be developed below.

## II. Analysis

Hedgepath raises three claims of error: (1) that the evidence against him, particularly the contents of his cell phone, should have been suppressed; (2) that the charges for the sexual assaults on January 15 should have been severed from those for the sexual assaults and murder on January 16; and (3) that the trial court erred by ruling that recorded statements of Reyes's children that "Bobby Jo" had assaulted their mother could not be introduced at trial. We address each claim in turn.

### A. The trial court properly denied Hedgepath's suppression motions.

Hedgepath's suppression claim consists of three sub-claims, each related to a separate suppression motion: (1) that all evidence gathered after the police "pinged" his cell phone should be suppressed as fruits of the poisonous tree; (2) that his SUV was unconstitutionally seized and any evidence discovered from it should be suppressed; and (3) that the search of his cell phone was unconstitutional and evidence from it should be suppressed.

#### 1. The fruit-of-the-poisonous-tree doctrine does not require suppression.

■ When Hedgepath failed to show up at the hospital, Detective Whittaker con-

---

1. SIM is "[a]n acronym for a subscriber identity module. Generally, a SIM card is a smart card that encrypts voice and data transmissions and stores data about a user for identification purposes." *Sigram Schindler Beteiligungsgesellschaft mbH v. Cisco Systems, Inc.*, 726 F.Supp.2d 396, 413 (D.Del.2010). It is "a removable card that allows phones to be activated, interchanged, swapped out and upgraded," and "is tied to the phone's network, rather than to the physical phone device itself." *In re Apple iPhone Antitrust Litigation*, 874 F.Supp.2d 889, 893 n. 5 (N.D.Cal.2012).

tacted AT & T to initiate a "ping" of Hedgepath's cell phone to determine its real-time location. AT & T required him to submit an affidavit under 18 U.S.C § 2702, which allows a cell phone provider to divulge information about a customer in various circumstances, including "if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." 18 U.S.C. § 2702(c)(4).[2] Detective Whittaker complied with this request by filing an "exigent circumstance form" describing the emergency as "2 missing juveniles ages 5 and 7 in the company of James Matthew Hedgepath who is not their father. Hedgepath is a possible suspect in the assault of the juvenile's [sic] mother Mary Reyes."[3] He testified that upon submission of that form, AT & T would send him information for 48 hours.

According to Detective Whittaker, his notifications from AT & T on January 17 indicated that Hedgepath's cell phone was turned off and its location could not be tracked at that time. At 5:15 p.m. on January 17, he learned that the children had been left with their grandmother around noon and were then in their father's care at that time. Nevertheless, Detective Whittaker did not ask AT & T to stop pinging Hedgepath's cell phone, and

he received information about Hedgepath's location the next morning, January 18 (apparently, the phone was turned on then).

Detective Whittaker acted on this information, going to the address given to him by AT & T. He, however, did not initiate contact with Hedgepath at that time; instead, Hedgepath called the Kentucky State Police, which patched the call through to Detective Whittaker. Detective Whittaker testified at one of the suppression hearings that Hedgepath stated he understood that the police wanted to speak with him. Detective Whittaker confirmed this and asked Hedgepath to go to the local Kentucky State Police Post. Hedgepath did so, driving there in his own vehicle.

Hedgepath now argues that his cell phone's location was obtained without a warrant and that there were no exigent circumstances on the morning of January 18 to justify obtaining that information without a warrant. He further argues that any evidence discovered directly or indirectly as a result of the ping should have been suppressed as fruit of the poisonous tree.

Whether the location information of a cell phone is entitled to constitutional protection under the Fourth Amendment is an open question, at least to the extent that neither this Court nor the U.S. Supreme

**2.** Various federal courts have held that this provision applies to location information. *See, e.g., United States v. Caraballo,* 963 F.Supp.2d 341, 361 (D.Vt.2013).

**3.** The pre-printed portions of the form stated, in part:

This agency [Kentucky State Police] has reasonably determined that an emergency exists that involves danger of death or serious physical injury to a person. As a result of the information developed during our investigation, we require the production of the information identified above. We believe the disclosure of the requested infor-

mation is "justified" as required by 18 U.S.C. § 2702(b) and (c). Furthermore, a prosecutor or judge is not available to obtain a search warrant.

. . . .

This agency needs disclosure of these records/communications in order to render assistance to the person who is in danger of death or serious physical injury. Because of the nature of the emergency, you are hereby requested to produce, or provide access to, the above described information and/or records as soon as possible.

Court has decided the question. *See United States v. Caraballo,* 963 F.Supp.2d 341, 352 (D.Vt.2013) (describing it as an "open question"); *Cucuta v. New York City,* 13 CIV. 558 AJP, 2014 WL 1876529 (S.D.N.Y. May 9, 2014) ("[I]t is far from clearly established whether an individual has a legitimate and reasonable expectation of privacy in his real-time location data conveyed by his cell phone, especially where law enforcement affirmatively pings a phone to determine its location.").

While the U.S. Supreme Court has recently held that the warrantless placement of a GPS tracking device on a suspect's car violates the Fourth Amendment, *see United States v. Jones,* —— U.S. ——, 132 S.Ct. 945, 949, 181 L.Ed.2d 911 (2012), it did so under a trespass theory, *id.* at 949–52. That is not what happened here. Instead, Detective Whittaker (really, AT & T) analyzed the electronic signals emanating from Hedgepath's phone to divine its location. As to "[s]ituations involving merely the transmission of electronic signals without trespass," the Supreme Court noted that they "would *remain* subject to *Katz* analysis." *Id.* at 953. The *Katz* analysis is the familiar reasonable-expectation-of-privacy test derived from *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

Whether a cell phone's real-time location information is protected under *Katz* is a difficult question. Some courts, including the Sixth Circuit, have held that, at least under some circumstances, there is no reasonable expectation of privacy in the data given off by a cell phone. *E.g., United States v. Skinner,* 690 F.3d 772, 777 (6th Cir.2012). Other courts have suggested that police intrusion into this data, at least when the phone is not travelling on a public roadway and is in a private residence, is limited to situations constituting an emergency, such as is allowed under 18 U.S.C § 2702. *See, e.g., Caraballo,* 963 F.Supp.2d at 362–63.

We do not have to resolve this "thorny question," *id.* at 360, however, because we do not believe that the fruit-of-the-poisonous-tree doctrine would extend to the incriminating evidence in this case (such as the videos on the cell phone), even if the "ping" was an unconstitutional search. Unquestionably, "the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (citations omitted). Exclusion "extends as well to the indirect as the direct products of [unconstitutional searches]." *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

But the fruits doctrine is not without limit. The test is not that "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Id.* at 487–88, 83 S.Ct. 407. "Rather, the more apt question in such a case is whether ... the evidence ... has been come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 83 S.Ct. 407 (citation and (internal quotation marks omitted)). "[E]vidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" *Segura,* 468 U.S. at 805, 104 S.Ct. 3380 (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)).

The driving force behind the fruit-of-the-poisonous tree doctrine "is that not

merely evidence [illegally] acquired shall not be used before the Court but that it shall not be used at all." *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). In other words, the doctrine prevents use of illegally obtained evidence in any way, including using the evidence to obtain other evidence.

The evidence about which Hedgepath is most concerned is his cell phone, specifically, the phone's contents.[4] But that evidence was not obtained because police discovered the location of Hedgepath or his cell phone through the pinging process. Neither the location of Hedgepath's cell phone nor the location of Hedgepath himself on the morning of January 18, 2010 was used thereafter to search for and seize the phone—or any other evidence, for that matter. The police did not proceed to the residence that Hedgepath had gone to and take him into custody, nor did they even talk to him face-to-face at that time. Instead, Detective Whittaker spoke with Hedgepath in the course of a call initiated by Hedgepath, who then voluntarily went to a police interview in his own vehicle.

The ping-location data was not used to locate the phone so that it could be seized. The cell phone became available to the police as a result of Hedgepath's voluntary contact with police and his decision to go to the KSP post, taking his phone with him from the apartment complex. If anything, Hedgepath brought the cell phone to the police, who eventually obtained a warrant to seize it. The police never used the location data because Hedgepath interrupted their investigation, removing any need to rely on or use the data.

The lack of a nexus between the location information learned with the ping and the evidence later recovered means there was no taint requiring use of the exclusionary rule for the evidence later obtained. And Hedgepath's actions in contacting the police and then voluntarily going to an interview with his phone in tow, albeit left in his vehicle, further attenuated the later evidence from the ping and purged any hint of a taint.

### 2. Seizure of SUV was legal under the automobile exception.

As noted above, Hedgepath was arrested after being interviewed by state police. At that time, he telephoned his sister, Sandy Thomas, and asked her to come get his keys to pick up his vehicle, the Nissan Pathfinder SUV, in which police eventually found his cell phone. Thomas got the keys and contacted Detective Whittaker to ask if she could pick up the SUV the next day; he said that she could. But when she went to retrieve the SUV the next day, January 19, Detective Whittaker would not release it to her. He testified at a suppression hearing that he had seen Hedgepath's cell phone sitting in the car and that "nobody was gonna take the vehicle until [the police] had a search warrant." He stated that by that time, the SUV's license plate had been checked and that he had learned the vehicle was registered to someone other than Hedgepath and there was no proof of insurance on the vehicle.

The next day, January 20, Detective Whittaker filled out an affidavit for a

---

4. At least, this is our presumption based on the fact that two of his three suppression motions focused on his cell phone. In his brief, he claims that the allegedly improper ping affected "all evidence obtained directly or indirectly of [his] cell phone being 'pinged.'" He does not identify his cell phone specifically. It, however, contained the most damning evidence against him. Moreover, he has not specifically identified any other evidence that should be suppressed. Thus it is reasonable for this Court to assume that his attack is directed at the contents of the cell phone.

search warrant and used it to obtain a search warrant for an apartment in Morganfield, Kentucky, and the SUV, which was still at the KSP Post in Henderson, Kentucky. The warrant specifically stated that police could seize any "cell phones" found in those locations. The search warrant was then executed, and the cell phone was seized.

The trial court, in addressing several claimed reasons the cell phone should be suppressed, concluded that the police properly kept the SUV on January 19. The court noted that Detective Whittaker had testified the vehicle was registered in Indiana and had an Indiana license plate but that Hedgepath lived in Kentucky. The Court concluded that Hedgepath's mere use of the vehicle did not make him a permissive user; that "Det. Whittaker would have a duty to investigate whether this inconsistency was the result of Mr. Hedgepath's failure to update the registration, whether Mr. Hedgepath had been loaned the vehicle by the true owner, or if the vehicle was stolen"; and that "[g]iven the information Detective Whittaker had on January 18 and 19, [he] acted reasonably and in good faith by denying Ms. Thomas access to the vehicle pending the resolution of the registration issues." The trial court also concluded that Detective Whittaker properly kept the SUV because he had probable cause to believe it contained evidence of a crime, such as blood from the assault since Hedgepath had been seen driving it, and that he had not acted unreasonably by waiting a day to obtain a search warrant.

Hedgepath now claims that Detective Whittaker constructively impounded the SUV on January 19 when Sandy Thomas went to retrieve it and that this warrantless seizure violated the Fourth Amendment.

The general rule is that warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357, 88 S.Ct. 507 (citation footnote omitted). One of those exceptions is the automobile exception. This exception recognizes

> "a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile ... where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."

*California v. Acevedo*, 500 U.S. 565, 569, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (quoting *Carroll v. United States*, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). In essence, there are "reduced expectations of privacy" in vehicles. *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). Thus, "a warrantless search of an automobile, based upon probable cause to believe that the vehicle contain[s] evidence of crime in the light of an exigency arising out of the likely disappearance of the vehicle, [does] not contravene the Warrant Clause of the Fourth Amendment." *Acevedo*, 500 U.S. at 569, 111 S.Ct. 1982 (citing *Carroll*, 267 U.S. at 158–59, 45 S.Ct. 280); *see also id.* at 580, 111 S.Ct. 1982 ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.").

Though the rule has frequently been couched in terms of exigency, there is no requirement of an independent finding of exigent circumstances when addressing automobiles. *See Maryland v. Dyson*, 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144

L.Ed.2d 442 (1999) ("[T]he 'automobile exception' has no separate exigency requirement."). The exigency discussed in *Carroll, Acevedo*, and other cases stems from the ready mobility of most vehicles and exists for all readily mobile vehicles. *Id.* Thus, the rule can now be expressed as follows: police may search a vehicle without a warrant if it is "readily mobile and probable cause exists to believe it contains contraband [or evidence of a crime]." *Id.*

■ There is no question that the SUV was readily mobile. Hedgepath had driven the vehicle the day before, and Thomas was at the KSP Post to drive it away. That the SUV was in police custody—seized or, as the trial court found, constructively impounded—does not change its ready mobility. *Cf. United States v. Johns,* 469 U.S. 478, 484, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (allowing search after DEA took vehicle back to headquarters); *United States v. Ludwig,* 10 F.3d 1523, 1528 (10th Cir.1993) ("The warrantless search of Ludwig's car therefore is not unreasonable even if there was little or no risk that Ludwig or a confederate would come out of the motel and drive away. If police have probable cause to search a car, they need not get a search warrant first even if they have time and opportunity.").

■ That leaves only the question whether Detective Whittaker had probable cause to believe that Hedgepath's SUV contained evidence of a crime. His probable-cause belief was supported by multiple items.[5] First, he had come to suspect Hedgepath assaulted Reyes because of his unlikely story (e.g., that he did not notice the extent of her injuries despite eating a meal and having sex with her on the night of January 16) and inconsistencies in his answers to police questioning. Second,

Hedgepath had been seen driving the SUV soon after Reyes was taken to the hospital and had driven the car to the police station. Physical evidence connecting him to the beating and sexual assault of Reyes, such as blood or hair, could easily have been transferred to the SUV as he drove around in it. Third, and more importantly, police could see Hedgepath's cell phone in plain view in the SUV. Hedgepath had repeatedly referred to his phone while he was interrogated, though he claimed it contained exculpatory proof. Given the phone's importance to Hedgepath at that time, police were justified in believing that the phone contained evidence related to the beating and sexual assaults.

Thus, the SUV was readily mobile and Detective Whittaker had probable cause to believe it contained evidence of a crime. Under the automobile exception, Detective Whittaker could have searched the vehicle at that time—even without a warrant. He chose not to do so, securing the vehicle instead, and waited until he obtained a warrant the next day before searching.

Of course, it could be argued that the police were entitled only to search the SUV and could not seize it when Thomas came to pick it up. But there is no suggestion in the case law that the rules operate substantially differently for searches and seizures, both of which must be founded on at least probable cause. Indeed, if anything, a seizure may be appropriate under circumstances in which a search would not, as a seizure works a lesser invasion of privacy than a search. This is part of the former rationale for allowing seizure of luggage from an automobile while waiting for a warrant to search it. *See United States v. Chadwick,* 433 U.S. 1,

---

**5.** For this reason, Hedgepath's claim that *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), controls this case fails. In that case, the Court concluded that there was no probable cause to justify seizure of the vehicle.

13, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) ("The initial seizure and detention of the footlocker, the validity of which respondents do not contest, were sufficient to guard against any risk that evidence might be lost. With the footlocker safely immobilized, it was unreasonable to undertake the additional and greater intrusion of a search without a warrant."); *Acevedo*, 500 U.S. at 575, 111 S.Ct. 1982 ("Law enforcement officers may seize a container and hold it until they obtain a search warrant."); *id.* ("Since the police, by hypothesis, have probable cause to seize the property, we can assume that a warrant will be routinely forthcoming in the overwhelming majority of cases." (quoting *Arkansas v. Sanders*, 442 U.S. 753, 770, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (Blackmun, J., dissenting))). This is also similar to the rationale that allows police to secure a place while they go to obtain a warrant. *See, e.g., Illinois v. McArthur*, 531 U.S. 326, 332, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (allowing police to secure house based on probable cause and exigent circumstances for two hours while obtaining a warrant).

That Detective Whittaker waited a day after seizing the SUV to search it did not render the search unconstitutional. As noted above, he could have seized and searched the vehicle without a warrant,[6] and a delay between seizure and search in such circumstances is acceptable. *See United States v. Johns*, 469 U.S. 478, 487, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (finding a three-day delay reasonable). While police must act diligently to obtain a warrant when they temporarily seize a resi-

dence or a closed package to secure it, *see, e.g., McArthur*, 531 U.S. at 332, 121 S.Ct. 946, that requirement stems from the fact that there is a full expectation of privacy in such things. But, as discussed above, there is a reduced expectation of privacy in mobile vehicles that serves as the very foundation on which the automobile exception is built. The reasonableness inquiry is thus much broader when dealing with vehicles. This Court concludes that Detective Whittaker's decision to wait one day to search the vehicle—and to obtain a search warrant—was not unreasonable.

**3. The search of the cell phone was legal because police had a sufficiently particular search warrant.**

Finally, Hedgepath claims that the police's search of the contents of his cell phone was unconstitutional because he had a reasonable expectation of privacy in those contents. He notes that the trial court ruled that he had no reasonable expectation of privacy in his phone in the course of denying his motion to suppress the contents of the phone.[7]

But just this summer, the Supreme Court held that there is a reasonable expectation of privacy in the contents of one's cell phone, *see Riley v. California,* —— U.S. ——, 134 S.Ct. 2473, 2485, 189 L.Ed.2d 430 (2014), especially in the age of so-called smart phones, which "differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person," *id.* at 2489. Thus,

---

**6.** As discussed below, however, his decision to wait until he had a search warrant to obtain and search the cell phone was fortuitous, as that is what made his search of the phone lawful.

**7.** The trial court held, in part, that while Hedgepath had initially given consent to search his cell phone with his many requests

to police to look at it during his interrogation, he withdrew that consent when he was arrested and invoked his constitutional rights, and he thus did not consent to the ultimate search of the phone. The Commonwealth does not argue on appeal that Hedgepath consented to the search, and this Court does not address that issue.

the Court concluded, the contents of a cell phone are not subject to a warrantless search incident to arrest, and "a warrant is generally required before such a search, even when a cell phone is seized incident to arrest." *Id.* at 2493.

 That, however, does not mean the trial court erred in declining to suppress the evidence. As the Supreme Court also noted, its "holding, of course, is not that the information on a cell phone is immune from search." *Id.* The Court held only that police could not conduct a warrantless search of a cell phone incident to arrest, and that "other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 2494. More importantly, however, is the fact that a warrant may justify the search of a cell phone, as it justifies the search and seizure of anything described with sufficient particularity and where probable cause exists. And the simple fact is that the police in this case had a search warrant that specifically included Hedgepath's cell phone as an item to be seized in a search of his apartment and vehicle.[8] This was not a warrantless search of the sort condemned in *Riley. See United States v. Brown,* 14–CR–20007, 2014 WL 3924635 (C.D.Ill. Aug. 11, 2014) (upholding search of cell phone post-*Riley* because "there was a warrant that specifically listed cellphones to be seized").

 Hedgepath acknowledges that the police had a warrant but argues that it did not "particularly describ[e] the content of the phone to be searched" and thus was insufficient to support a search of the phone. While it is all but axiomatic that a search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized," U.S.

Const. amend. IV, this Court is not convinced that the warrant in this case was insufficiently particular. While portions of the warrant were broadly drafted, e.g., allowing seizure of "all personal property," the warrant specifically included "cell phones."

And though the warrant did not limit the parts of the cell phone that could be searched, or the types of files or data that were to be sought, the clear thrust of the warrant was for evidence related to the physical and sexual assaults committed on Mary Reyes. The warrant allowed seizure of

> any and all items that may have been used to aid in the assault; the clothing worn by ... Hedgepath on January 16 through the time of his arrest ...; any and all items that may contain physical evidence of an assault; the blood, semen, other fluids, fingerprints, fibers, hair samples and/or other similar product [sic] that may be present as the result of an assault and/or that show physical presence in a location and the items containing these things; any and all places in size where any of the above described personal property may be stored, hidden, and/or concealed. Also all personal property including but not limited to all electronic equipment, computers, and cell phones.

The affidavit for the search warrant included the same language and stated that the officer believes the property constitutes "property or things used as a means of committing a crime" or "property or things consisting of evidence which tends to show a crime has been committed or a particular person committed a crime," with the crime being an assault that left the

---

8. The warrant stated that police were to seize various types of evidence related to the assault. The final category read: "Also all personal property including but not limited to all electronic equipment, computers, and cell phones."

victim with "life threatening injuries" and "on life support."

The police searched for and found evidence of Hedgepath's physical and sexual assault of the victim. They did not find evidence of other crimes, such as drug possession or theft. The search warrant and affidavit were sufficiently particular, both as to the cell phone and the type of evidence sought, to make the search of the cell phone reasonable.

**B. Joinder of Hedgepath's offenses was not reversible error.**

■ Hedgepath also claims that several of his charges, those for the sexual assaults that occurred on January 15, should have been severed from the other charges for the assaults and murder that occurred on January 16. He admits that joinder of offenses is allowed "if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan," RCr 6.18, but claims that they should have been severed under Criminal Rule 9.16. That rule states, in relevant part, that "[i]f it appears that a defendant ... is or will be prejudiced by a joinder of offenses ... in an indictment ... or by joinder for trial, the court shall order separate trials of counts ... or provide whatever other relief justice requires." RCr 9.16.

■ Severance under this rule, however, is subject to the trial court's "broad discretion," *Hammond v. Commonwealth,* 366 S.W.3d 425, 429 (Ky.2012), and is thus reviewed for abuse of discretion, *id.* And "to be reversible, an erroneous joinder of offenses must be accompanied by a showing of prejudice to the defendant. This showing of prejudice cannot be based on mere speculation, but must be supported

by the record." *Id.* (citations and internal quotation marks omitted).

This Court discerns no abuse of discretion and sees no prejudice to Hedgepath from the joinder of his offenses. Indeed, this is a classic case where joinder of the offenses was appropriate. All the offenses, save one about which there is no complaint,[9] occurred in the same two-day spree of physical and sexual assault against Mary Reyes. The offenses were of the same or similar character, and part of a scheme of assault, and they all were directed at the "abuse and murder of the same ... victim," *Peacher v. Commonwealth,* 391 S.W.3d 821, 837 (Ky.2013).

Hedgepath nevertheless claims the joinder prejudiced him, noting that a major factor in that determination is whether evidence of one offense would be admissible in a trial of the other offense. *See Roark v. Commonwealth,* 90 S.W.3d 24, 28 (Ky.2002). But there is little question that the evidence of the offenses committed on January 15 would have been admissible at a trial of the offenses committed on January 16, and vice versa. For example, KRE 404(b) generally bars evidence of other crimes and bad acts but it allows such proof "[i]f so inextricably intertwined with other evidence essential to the case that separation of the two ... could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2). It is difficult to conceive how the story of either day's offenses could be told without reference to the other given that they were part of the same assaultive spree against a single victim.

That Hedgepath may have taken a break from his crimes during this two-day period does not somehow make joinder erroneous. Thus, we have frequently held

9. This offense was the charge of tampering with physical evidence, which related to the

removal and possible destruction of the SIM card from Hedgepath's cell phone.

that a series of assaults against the same victim, even if spread over a lengthy period of time, are properly joined for trial. *See, e.g., Montgomery v. Commonwealth,* 320 S.W.3d 28, 35 (Ky.2010) (approving joinder "of six sexual offenses against the same minor victim in the same residence over a five and one-half month period"). The prejudice concerns that Hedgepath raises are more likely "the trial of the same or similar offenses perpetrated against *different victims.*" *Id.* (emphasis added). But such cases "present different considerations not applicable here," *id.,* where the offenses were all committed against the same victim in a relatively short period of time.

The trial court did not abuse its discretion in refusing to sever Hedgepath's various charges.

**C. The trial court did not err in excluding the children's statements.**

 Hedgepath sought to admit the recorded statements of Mary Reyes's two young children. At the time of trial, the children could not be found (they had been handed over to their father and may have been taken to Mexico). When police first interviewed the children, they said that someone named "Bobby Jo" hit their mother, though the officer taking the statement later said at a preliminary hearing that he could not get the children to pin down exactly when this occurred. In a subsequent forensic interview, the children identified Hedgepath as the person who had assaulted their mother on January 15–16. Hedgepath claims the recordings should have been admitted to impeach the credibility of the police investigation, which he claims improperly focused on him and failed to look at possible alternative

perpetrators of the crime, and to impeach the integrity of the forensic interviews conducted with the children.

The trial court excluded this evidence because its primary intended use was as improper hearsay in support of an "aaltperp"[10] theory, namely, to prove that someone named Bobby Jo assaulted Mary Reyes. The trial court also noted that the statements were made by very young children whose competency to testify could not be tested, and that the statements were contradictory and potentially confusing for the jury. The trial court also cited testimony that the children later identified Bobby Jo as a man who was incarcerated at the time of the crimes against Mary Reyes.

Hedgepath argues now, as he did to the trial court, that the recorded statements were not intended to be used as hearsay but were only for impeachment purposes to show the police did not adequately, investigate an alternative perpetrator and that he had a due-process right to make a defense.

 This Court agrees with the trial court that Hedgepath sought to use the recordings to support an aaltperp theory, even if indirectly. While defendants generally have a right to produce such proof, even when its admission would contradict the Rules of Evidence, it "is not automatically admissible simply because it tends to show that someone else committed the offense." *Beaty v. Commonwealth,* 125 S.W.3d 196, 208 (Ky.2003). We have suggested that a defendant should show at the very least an aaltperp's motive and opportunity to commit the crime. *Id.* The trial court is justified in excluding such evidence "when the defense theory is unsup-

---

10. "Aaltperp" means "alleged alternative perpetrator." *Beaty v. Commonwealth,* 125 S.W.3d 196, 207 (Ky.2003).

ported, speculative, and far-fetched and could thereby confuse or mislead the jury." *Id.* at 207 (internal quotation marks and brackets omitted).

As noted by the trial court, the person identified as Bobby Jo had no opportunity to commit the crime because he was incarcerated. Any suggestion that the name "Bobby Jo" could refer to some other person is unsupported and speculative.

Hedgepath's attempt to indirectly raise this aaltperp theory by claiming an inadequate police investigation did not justify admitting the recordings. In this case, the thoroughness of the police investigation into an alternative perpetrator was irrelevant. Indeed, such proof, under these circumstances, could only be relevant if Hedgepath had made a prima facie showing of an aaltperp, at which point such proof could conceivably be seen as indirectly showing that Hedgepath did not commit the crimes. Otherwise, whether the police sufficiently looked into other possible perpetrators has no bearing on whether Hedgepath committed the crime. Finally, the trial court's decision excluding this evidence must be viewed in light of that fact that the evidence against Hedgepath included videos taken from his cell phone showing him physically and sexually assaulting the victim. That is as close to the proverbial smoking gun as it gets. Such proof further renders his indirect aaltperp theory far-fetched and implausible.

We cannot say that the trial court erred in excluding this evidence, even in light of its implication for Hedgepath's right to make a defense. That right, while broad, is not unlimited.

### III. Conclusion

We conclude that the trial court did not err in refusing to suppress evidence against Hedgepath, including the videos found on his cell phone; in refusing to sever the charges; or in excluding the recorded interviews with the victim's children. Finding no error, Hedgepath's conviction and sentence are affirmed.

All sitting. All concur.

