2020 IL App (2d) 170379
No. 2-17-0379
Opinion filed November 24, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-2843 |
| JOSE E. REYES, | ) ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justice Zenoff concurred in the judgment and opinion.
Presiding Justice Birkett specially concurred, with opinion.

**OPINION**

¶ 1                              I. INTRODUCTION

¶ 2     Following a bench trial, defendant, Jose E. Reyes, was convicted of aggravated kidnapping (720 ILCS 5/10-2(a)(2) (West 2012)), predatory criminal sexual assault of a child (*id.* § 11-1.40(a)(1)), and three counts of child pornography (two counts of filming or videotaping (*id.* § 11-20.1(a)(1)) and one count of possession of child pornography (*id.* § 11-20.1(a)(6)). Defendant was sentenced to four consecutive 30-year sentences on aggravated kidnapping, predatory criminal sexual assault of a child, and the two counts of filming or videotaping child pornography. He was also sentenced to a concurrent sentence of seven years on the count of possession of child

pornography. On appeal, defendant argues that the trial court erred in denying his motion to suppress evidence obtained from his cell phone pursuant to a search warrant. Additionally, defendant argues that we should vacate one of the two convictions of child pornography based on filming or videotaping under the one-act, one-crime doctrine. For the following reasons, we affirm.

¶ 3                                    II. BACKGROUND

¶ 4     On September 30, 2013, M.G. was three years old. Just before 5:30 p.m. that day, she was playing in front of the apartment building in Mundelein, where she lived with her family. M.G.'s sisters, D.G., age nine, and W.G., age five, were playing with her while their mother, C.G., was caring for their infant brother in their second-floor apartment. M.G.'s father, A.G., was at work in Des Plaines. A black, four-door vehicle passed by the girls twice and then came back a few minutes later and stopped. The driver, a man, got out of the vehicle and approached the girls. He offered the girls lollipops. After briefly speaking to the girls, in Spanish, the man grabbed M.G., carried her to his car, placed her inside, and drove off. C.G. heard D.G. scream. C.G. looked out the window and saw the man carry M.G. toward the black car. C.G. ran downstairs, but, by the time she got outside, the car had driven away.

¶ 5     The Mundelein police arrived on the scene within minutes. While they were interviewing witnesses, the black car drove through the rear parking lot of the apartment building and dropped M.G. off. She was crying and ran away from the car.

¶ 6     A.G. arrived home after M.G. had been reunited with her family. M.G. was sad and did not want to speak. A.G. took M.G. and police officers up to the family's apartment. Officers asked M.G. questions, but she was not answering. M.G. told A.G. that she wanted to go to the bathroom. A.G. noticed bloodstains in M.G.'s panties. M.G. told A.G. that "her parts were hurting." A.G. told the police what M.G. said, and the police collected the panties as evidence.

¶ 7      M.G. was taken to Condell Medical Center in Libertyville, where she was examined by a sexual assault nurse examiner, Chenel Vanderberk-Flores. Using a rape kit, Vanderberk-Flores collected items of evidence and took photographs of M.G. M.G. was in a lot of pain when she urinated, and she "seemed uncomfortable and overwhelmed." Vanderberk-Flores observed a "very atypical redness" around the opening of M.G.'s vaginal area. Vanderberk-Flores opined that the redness around M.G.'s vaginal area was consistent with an act of penetration.

¶ 8      Dr. Patrick Dolan, a pediatric emergency room doctor and the director of the sexual assault team at Condell Medical Center, examined M.G. He opined that the injury or redness on M.G.'s vaginal area was consistent with an act of penetration.

¶ 9      Within two days, the Mundelein police identified defendant as a suspect in the kidnapping and molestation of M.G. They also tied defendant's vehicle to the abduction. On October 3, 2013, defendant was located at his workplace in Libertyville. His vehicle was in the parking lot. Defendant was charged by complaint with aggravated kidnapping, kidnapping, and unlawful restraint of M.G. Defendant's vehicle was secured, and a search warrant was issued for defendant's residence and his vehicle. The police located, seized, and secured three electronic devices from defendant's vehicle: a Huawei cell phone, a Garmin Nuvi 1350 global positioning system (GPS) unit, and a black 120 GB media player. On October 8, 2013, a search warrant was issued authorizing the search of the electronic devices.

¶ 10     Carol Gudbrandsen, a cybercrimes forensic analyst with the Lake County State's Attorney's office, conducted the search of defendant's cell phone. She found images of M.G. in two videos. One showed M.G. riding in defendant's vehicle, and the other showed M.G. naked from the waist down while sitting on defendant's lap with his penis in contact with her vagina. In the video, defendant can be heard speaking to M.G. in Spanish and M.G. can be heard crying out

"ow, ow, ow." Stills were taken from the video showing an image of M.G.'s vagina and another showing defendant's penis in contact with M.G.'s vagina. The images recorded on the video formed the evidentiary basis for defendant's child pornography charges.

¶ 11                    A. The Complaint for a Search Warrant

¶ 12    Detective Marc Hergott of the Mundelein Police Department was the affiant in the seven-page complaint for a search warrant (complaint) to search the electronic devices recovered from defendant's vehicle. In the complaint, Hergott requested the authority to search the devices for evidence of the offenses of predatory criminal sexual assault of a child, aggravated criminal sexual assault of a child, aggravated kidnapping, and unlawful restraint. The child-pornography charges are not mentioned in the complaint. Hergott averred that he believed that the devices were "used in the commission of or constitute evidence of" the listed offenses. Hergott stated that he had been employed as a police officer for 23 years. He stated that he had "received ongoing training in the area of child sexual abuse/assault/exploitation, and training in computer crimes involving children." He explained that "cellular phones and cellular phone technology" have revolutionized the way digital photographs are "viewed, produced, distributed, stored, and utilized." Hergott discussed in detail how evidence that has been deleted from a cell phone's memory can be recovered and viewed "months or even years later." Hergott said that a cell phone is an "ideal repository" for this type of evidence and can store "dozens of images and text."

¶ 13    Next, Hergott discussed how computers and computer technology "have revolutionized the way in which child pornography is viewed, produced, and utilized." Hergott explained the ease with which child pornography can now be produced and distributed using technology as compared to the past, when production required facilities and a dark room and distribution was through "personal contact, mailings, and telephone calls." Hergott explained that individuals who "collect

and trade child pornography via computer" store the images electronically and often keep them "for long periods of time, so the individual can view these images at his discretion." Hergott stated that the "data search protocols" would "protect the integrity" of any evidence and would allow for recovery of "hidden, erased, compressed, password-protected, or encrypted" evidence.

¶ 14    Hergott next described how devices with GPS capability can be searched to discover the movements or route of the user. Defendant concedes on appeal that the complaint established probable cause to search the GPS data stored in the devices recovered from his vehicle.

¶ 15    Hergott described the evidence gathered during the investigation. He described the interview with C.G., who witnessed a man carry M.G. to his car. Hergott recounted the police interview with D.G., where she described the encounter with the suspect and how he offered her lollipops and spoke in Spanish to M.G. before kidnapping her. Hergott included D.G.'s detailed description of the suspect. D.G. remembered that there was a "7" on the license plate and stated that "it was the first number." D.G. had never seen the man before, and she worked with a forensic artist to prepare a composite sketch of the suspect.

¶ 16    Hergott described information provided by Gina Johnson, a witness who lived in a neighboring building. Johnson witnessed the abduction, and her description of the suspect was consistent with D.G.'s description.

¶ 17    Hergott stated that, about 20 minutes after the police arrived at the apartment building, there was a 911 call about a little girl in the building's parking lot, screaming for her mother. The girl was M.G.

¶ 18    Hergott stated that video footage was obtained from security cameras at the front and rear of the apartment building. M.G.'s abduction was captured on the video. Video from the rear of the

building shows a car matching the witnesses' description dropping M.G. off. M.G. is seen getting out of the passenger side of the vehicle and running away.

¶ 19 Hergott also described the interview with A.G. M.G. told A.G. that her genital area hurt. Hergott stated that M.G. was taken to Condell Medical Center and that blood was found in her underwear and redness around her vagina.

¶ 20 The vehicle used by the suspect was determined to be a 2006 to 2008 Hyundai Accent GLS with custom chrome wheels. Mundelein police obtained from the Secretary of State a list of all vehicles registered in Lake County that matched, and they compared that information to tickets that had been issued by the Mundelein Police Department. This process led the police to the registered owner, defendant, whose physical characteristics matched the description given by witnesses. Defendant's driver's license photo was similar to the composite sketch prepared by D.G. and the forensic artist.

¶ 21 Hergott described the police interview with defendant on October 2, 2013. Defendant was shown a photo of the suspect's vehicle taken from the video surveillance outside the apartment building where M.G. was abducted, and he admitted that it was his vehicle. Defendant said, "no one else had possessed the vehicle and [he] drove it that night." Defendant's vehicle had a "7" on its license plate, and there appeared to be a bottle of lotion in plain view in the back seat. Defendant said that he went to work the night of the incident and then went directly home. He said that he worked from 6 p.m. on September 30, 2013, until 5 a.m. on October 1. Work records from defendant's employer showed that defendant was seven minutes late on September 30.

¶ 22 Hergott stated that, based upon all the information provided in the complaint, he believed that evidence of the offense of predatory criminal sexual assault of a child, aggravated criminal

sexual abuse, aggravated kidnapping and unlawful restraint was located on the electronic devices described in the complaint.

¶ 23    Hergott presented the complaint to Judge Collins, who issued the warrant, finding that the complaint set forth facts sufficient to show probable cause to search the devices and

> "seize and analyze: any and all records of incoming and outgoing phone calls, any video recordings, memory/speed dial-redial features, contacts, voicemail features, images and metadata, videos, address book, text messages, any passwords, maps, GPS locations, computer and cell phone applications, documents, emails, internet activity and searches, and all items which have been used in the commission of or which constitute evidence of the offenses of predatory criminal sexual assault of a child in violation Illinois Compiled Statute 720 ILCS 5/11-1.40(a)(1), aggravated kidnapping in violation of Illinois Compiled Statute 720 ILCS 5/11-1.60, aggravated kidnapping in violation of Illinois Compiled Statute 720 ILCS 5/10-2(a)(2), kidnapping in violation of 720 ILCS 5/10-1(a)(1), and unlawful restraint in violation of Illinois Compiled Statute 720 ILCS 5/10-3."

The warrant did not distinguish among the devices or exclude any file locations to be searched.

¶ 24                    B. Defendant's Motion to Suppress Evidence

¶ 25    Defendant argued that Judge Collins erred in finding probable cause to search his cell phone. Citing *People v. Beck*, 306 Ill. App. 3d 172, 178 (1999), defendant noted that a probable cause determination requires a sufficient nexus between the criminal offense, the items to be seized, and the place to be searched. He argued that there was no nexus between the crime and the cell phone.

¶ 26    The State argued in its response to defendant's motion to suppress that, given the location of the phone when it was found, together with the "locus of the criminal activity, it is reasonable

to believe that the phone would contain some evidence (photos, videos, GPS information) of criminal activity." The State argued that the facts set forth in the complaint, together with "reasonable and common-sense inferences," satisfied the nexus requirement.

¶ 27   No evidence was presented during the hearing on the motion to suppress. The court considered the search warrant, the complaint, the written pleadings, and the arguments of counsel. During arguments on the motion, defense counsel argued that "[n]ot a single witness states that a cell phone was used in the commission of the offense. Not a single witness or piece of police information indicate that there were accomplices, for example." Counsel argued that, without evidence of accomplices, the search of phone logs and text messages should not be allowed. Concerning the GPS data, counsel argued that it was not relevant, because the "crime happened near this parking lot." Counsel argued that most important were the video files. Counsel stated, "[s]o maybe the magistrate should have signed a search warrant that would allow for the search for GPS data, but definitely not for video files, definitely not for text messages, definitely not for phone calls, because there is nothing in the complaint that says or even suggests phone calls would [*sic*] be made."

¶ 28   Defense counsel argued that the information in the complaint was the result of "cut and paste." He argued that "child pornography and how, in a digital age, child pornographers use phones to look at videos again has nothing to do with this case because there is no evidence whatsoever that they [*sic*] would be relevant, discoverable, or any type of video file in the cell phone." Defense counsel noted the deferential standard accorded to the issuing judge but further noted that, even under the "common sense approach, there is zero reason to even open that video file."

¶ 29　The State argued that missing from defendant's argument were all the relevant facts Hergott laid out in the complaint, "not just that he believes there might be evidence on the cell phone." The State argued that the facts and the reasonable inferences established the nexus. The State pointed out that defendant's car was gone for a short period of time, there was an "injury with blood," "some sexual assault had taken place," and the car appeared to be the locus of the crime. The State made an analogy to the time before digital cameras, pointing out that if there had been a murder or a sexual assault in a room and someone found a camera with film in it, it would not be unreasonable to apply for a search warrant. "That is exactly what the police did in this case—they found a camera and what they believe to be a crime scene, what eyewitnesses said was a crime, and they asked for a search warrant and they obtained one." The State also stressed that there were no allegations that Hergott made any misrepresentations to Judge Collins. The State argued that Hergott's training and experience regarding the behavior of "people who take pictures of children or offend against children [and] have those images and save digital media to preserve the experience" was presented to Judge Collins.

¶ 30　The State asserted that Hergott's affidavit demonstrated "that the offender had a plan. He offered lollipop candy to the girls." Thus, it was "not unreasonable to think he had a plan for preserving that act or retaining evidence of that act after the crime, as well," and that he "would use that phone." The State argued that the cell phone had a camera that was found at the crime scene, which "is the most direct nexus that is alleged." It observed that Judge Collins had the opportunity to explore the facts with Hergott as he saw fit. The State noted that cell phones are a common part of life, that it is "very common for people to pull out their cell phone and take a picture of what is going on," and that it is not unreasonable to think that defendant would do so "under these circumstances." The State reiterated that the facts contained in the complaint—the

short period of time that M.G. was with defendant, the blood, the candy, and the lotion in the car—suggested that a crime had taken place. Also found in the car was a cell phone "that records experiences."

¶ 31 During rebuttal argument, defense counsel argued that the cell phone was not found on the day of the crime. Counsel argued that most people keep their cell phones on the seat in their vehicle and that, just because the cell phone was found "doesn't mean that there was a photographic experience taken." Counsel stated, "I think it's highly unusual for somebody to take [*sic*] an assault." He asserted that it would be "actually incredibly rare" for someone to tape an assault. Counsel acknowledged that the affidavit discussed child pornography, but he pointed out that it does not state how common it is for people to tape assaults. Defense counsel stated that he did not see the connection, even though taping an assault is, "I guess, technically, *** child pornography." Counsel acknowledged that Judge Collins "could have asked questions, but if the State has a faulty affidavit, they have to bring in the detective to say, 'well, actually, Collins asked this question.' " Counsel asserted that the affidavit was merely "a description of a sexual assault, and *** a description of how cell phones are used in child pornography. I think you will see there is not a critical nexus, between looking at why somebody videotapes an attack."

¶ 32 Defense counsel argued that, even if there was probable cause to search the phone for GPS data, "that doesn't get you into the video compartment." The trial court asked defense counsel if he had any cases to support his "compartmentalization" argument. Counsel cited *People v. Moser*, 356 Ill. App. 3d 900 (2005), a case that involved a search of a house for controlled substances. The trial court asked defense counsel if he had any authority involving cell phones, and counsel said he did not and would "have to spend more time."

¶ 33    The State noted that the exclusionary rule "is there to prevent police misconduct. In this case, the police sought and obtained a warrant." The State also said that the police could have "specified the scope" if they did not believe that there was probable cause to search "the entire phone."

¶ 34    The trial court offered defense counsel the opportunity to argue "or advance any other cases if you know of any." The court said that it had considered the "four corners" of the complaint, the arguments of the attorneys, and its own experience. The court likewise made clear that it had carefully considered defense counsel's nexus argument. It noted that there was no suggestion that there was insufficient evidence that a crime had been committed or that there were any false representations in the affidavit. The court found that "the assertions were supported by the affidavit," and it denied the motion to suppress the evidence. Although offered the opportunity to do so, defense counsel did not file a motion to reconsider or offer additional authority regarding his nexus argument.

¶ 35                    C. The Trial

¶ 36    Prior to trial, the State disclosed that defendant had been identified by DNA lab results as the perpetrator of a sexual assault of a minor on August 24, 2012, in Du Page County. The State agreed to defendant's motion *in limine* to exclude evidence related to the Du Page County case.

¶ 37    During the first day of jury selection, defendant waived his right to a jury trial and proceeded to a bench trial. Defense counsel explained that the decision to waive a jury trial was due to the trial court's ruling on the motion to suppress.

¶ 38    At trial, the State introduced the evidence outlined in Hergott's affidavit. The State also offered the video and still photographs taken from defendant's cell phone showing the image of defendant's penis in contact with M.G.'s vagina and the image of M.G.'s vagina.

¶ 39    A.G. testified that, after he arrived at the apartment building, he took M.G. up to the family's apartment, along with the police officers. The officers attempted to interview M.G., but she would not answer any questions. M.G. wanted to go to the bathroom to "do a pee-pee." While helping M.G. go to the bathroom, A.G. saw bloodstains on M.G.'s panties. M.G. told A.G. that her "parts were hurting." The police collected the panties as evidence.

¶ 40    Sperm cells recovered from the shorts M.G. was wearing matched defendant's DNA, and male DNA was on the vaginal swab from M.G.'s rape kit. A lollipop was recovered at the scene of the abduction, and it matched the lollipops recovered from defendant's vehicle.

¶ 41    D.G. testified to the facts outlined in Hergott's affidavit. D.G. identified the composite sketch along with a photo lineup where she identified defendant's photo. She identified defendant in open court.

¶ 42    The trial court denied defendant's motion for a directed verdict. Defendant presented stipulations and exhibits regarding lineup procedures along with a written statement to impeach one of the State's identification witnesses.

¶ 43    The trial court found defendant guilty of all counts. Defendant's motion for a new trial argued that the trial court erred in denying his motion to suppress evidence. Defense counsel argued at the hearing on the motion that, "while GPS data may have been relevant, there was no reason to go into the video files." The motion was denied. Following sentencing and defendant's motion to reconsider the sentence, defendant timely appealed.

¶ 44                                III. ANALYSIS

¶ 45    Defendant appeals his child pornography convictions. First, he contends that the videos taken from the cell phone should have been suppressed because the search warrant was not supported by probable cause and the police did not act in good faith. Second, he argues that one

of his convictions must be vacated pursuant to the one-act, one-crime rule. We disagree with both contentions.

¶ 46                                     A. Search Warrant

¶ 47                                     1. Probable Cause

¶ 48     With numerous exceptions, the fourth amendment to the United States Constitution (U.S. Const., amend. IV) requires the State to obtain a search warrant prior to conducting a search. *People v. Lampitok*, 207 Ill. 2d 231, 243 (2003). Generally, probable cause "is required for issuance of a search warrant." *People v. Rojas*, 2013 IL App (1st) 113780, ¶ 15. "Probable cause" means that the facts available to the individual seeking the warrant are "sufficient to warrant a person of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched." *People v. Griffin*, 178 Ill. 2d 65, 77 (1997). It is assessed with reference to "the totality of facts and circumstances known to an affiant applying for a warrant at the time the warrant is sought." *People v. McCarty*, 223 Ill. 2d 109, 153 (2006).

¶ 49     We will disturb a trial court's decision regarding a motion to suppress only if it is manifestly erroneous. *People v. Redmond*, 114 Ill. App. 3d 407, 417 (1983). Our review requires us to consider whether the judge issuing the search warrant had a substantial basis for concluding that probable cause existed. *People v. Brown*, 2014 IL App (2d) 121167, ¶ 23. Therefore, "if the complaint provided a substantial basis for the issuing judge's probable-cause determination, we will affirm the trial court's denial of a defendant's motion to quash and suppress." *Id.* Moreover, we may affirm on any basis appearing in the record. *People v. Mujica*, 2016 IL App (2d) 140435, ¶ 13. Finally, a sworn complaint seeking a search warrant is presumed true. *McCarty*, 223 Ill. 2d at 154. As defendant here does not attempt to controvert the facts set forth in the complaint, we will accept them as true. See *People v. Manzo*, 2018 IL 122761, ¶ 32.

¶ 50 Defendant argues that the trial court committed reversible error by denying his motion to suppress the child pornography videos discovered on the phone. He contends that the warrant to search the phone was not supported by probable cause, because Hergott's complaint did not establish a nexus between the videos and the charged offenses. He claims that "not one person ever witnessed the defendant carrying a [cell] phone on the day of the offense, much less him recording an illicit act."

¶ 51 However, the complaint made clear that the phone could be a source of photographs, video, voice recordings, and text communications. Such data, actively created by the user, theoretically could include recordings of the offenses. Defendant essentially argues that there is no nexus between the offenses and the phone because the complaint did not allege that he actively created data during the offenses; that is, the warrant was not supported by probable cause because Hergott failed to allege some basis to conclude that defendant "used" the phone while committing the offenses.

¶ 52 Contrary to defendant's assertion, suppression is not required simply because the complaint did not allege that defendant actively created data in furtherance of the offenses. The complaint broadly sought data "which constitute[s] evidence of the offenses," which is consistent with the test for probable cause. *Griffin*, 178 Ill. 2d at 77. Probable cause to issue the warrant existed because there was a fair probability that evidence of the offenses would be found on the phone. *People v. Hickey*, 178 Ill. 2d 256, 285 (1997). The variety of functions that a cell phone can perform illustrates why. Cell phone evidence of an offense includes not only the photographs, audio, or video of the offenses being committed but also GPS data that might indicate where the crime occurred or indicia of the identity of the perpetrator.

¶ 53    Here, the complaint's descriptions of GPS technology and the abduction were sufficient to warrant a person of reasonable caution to believe that the phone's contents would identify defendant as the offender and reveal where the offenses were committed. The complaint generally identified "maps, GPS locations, *** [and] cell phone applications" as containing evidence of the offenses. The complaint included a detailed explanation of how a user can activate GPS to trace the path of the device. Moreover, it is common knowledge that a phone like the one in this case also passively generates, collects, and processes tracking data on its own, without the user's input. Cell-tower transmissions maintain the phone's connection to the network, and GPS software calculates the phone's location.

¶ 54    The complaint was presented in unlabeled sections addressing the phone, the Garmin unit, and the media player. Admittedly, the section of the complaint addressing the phone focused on data storage relative to child pornography, not on maps or GPS. However, the complaint broadly stated that "[c]omplainants have probable cause to believe *** that the above listed things to be seized[, including GPS data,] are now located upon the property set forth above[, including the phone]." Under our deferential standard of review, we may attribute the GPS section of the complaint to the phone. *People v. Burns*, 2016 IL 118973, ¶ 15 (a circuit court's finding of fact is given deference when ruling on a motion to suppress and will be reversed only when those findings of fact are against the manifest weight of the evidence); *People v. Stewart*, 104 Ill. 2d 463, 477 (1984) (in determining whether an affidavit demonstrates the existence of probable cause, the resolution of a doubtful or marginal case should largely be determined by the preference to be accorded to the warrant). A commonsense interpretation of the complaint is that the phone and the Garmin unit were each capable of performing GPS functions. See *Riley v. California*, 573 U.S. 373, 399 (2014) ("Even an individual pulled over for something as basic as speeding might well

have locational data dispositive of guilt on his phone."). Thus, one cannot reconcile defendant's concession that there was probable cause to search the Garmin unit with his argument that there was not the same nexus between the offenses and the phone.

¶ 55    Defendant's reliance on *Manzo*, 2018 IL 122761, is misplaced. In that case, the supreme court determined that the complaint for a warrant was "bare bones" because it failed to establish a nexus between the target of the search (the defendant's home) and the items sought to be recovered (certain drugs and other indicia of drug trafficking). *Id.* ¶ 69. As a conclusory statement alleging probable cause is not sufficient, a court of review will not defer to a warrant based on a bare-bones affidavit. *Rojas*, 2013 IL App (1st) 113780, ¶ 16. An affidavit is "bare-bones" where it is completely lacking in setting forth a basis for probable cause. *Id.* ¶ 22; see also *People v. Reed*, 202 Ill. App. 3d 760, 764 (1998) (holding affidavit was "bare-bones" where "none of the defendants in question were named or otherwise described or identified in the affidavit"). A bare-bones affidavit is " 'one that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." ' " *Manzo*, 2018 IL 122761, ¶ 67 (quoting *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017), quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005)). Conversely, if an affidavit presents "at least an arguable showing of probable cause," it is not bare bones. *Beck*, 306 Ill. App. 3d at 181.

¶ 56    The complaint in *Manzo* averred that a police officer had purchased cocaine from a seller three times. *Manzo*, 2018 IL 122761, ¶ 5. On one occasion, the seller arrived at the point of sale driving a vehicle registered to the residence to be searched. *Id.* ¶ 6. Law enforcement records showed that the seller was an associate of the vehicle's owner. *Id.* ¶ 9. On a subsequent occasion, the seller was observed leaving the residence shortly before the sale. Additionally, two of the three

transactions occurred near the residence. *Id.* ¶¶ 7-8. Based on these allegations, a warrant to search the residence was issued, and incriminating evidence was seized. *Id.* ¶ 10.

¶ 57    In holding that the complaint failed to establish a sufficient nexus between the criminal activities and the defendant's home, the supreme court expressly concluded that probable cause was not established by the seller driving a vehicle registered to an occupant of the residence. *Id.* ¶ 39. The court commented that "[t]he fact that an alleged drug dealer drives another individual's car to one drug deal does not create an inference that the vehicle's owner has contraband in his or her home and does not justify a search of the vehicle owner's home. To hold otherwise could expose virtually any innocent third party to a search of the home." *Id.* ¶ 41.

¶ 58    In *Manzo*, observations of a drug dealer driving a car registered to a residence and drug sales near that residence did not establish a nexus between the drugs and the residence. In contrast, the nexus between the phone and the offenses in this case is clear: the GPS data passively collected by the phone during the offenses would yield evidence of the offender's identity. When the warrant was issued, the police had not yet identified defendant as the person who sexually assaulted the victim. The phone's geolocation records would allow law enforcement to trace defendant's path, corroborating other evidence or producing investigative leads, such as additional witnesses or surveillance video. The phone's mere presence in a car that was seen driving away with the victim would be "sufficient to warrant a person of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched." *Griffin*, 178 Ill. 2d at 77.

¶ 59    Defendant argues that it is unreasonable to infer that the phone was present during the offenses, because two days elapsed before it was found in his car. He claims:

> "Presumably, in those two days, the defendant would have slept. He would have eaten various meals. He would have spent one day at work. He would have driven throughout

town, [a]nd to accomplish those everyday needs, he would have carried his phone with him."

Defendant's argument proves too much. He effectively concedes that he carried around his phone from the time of the offenses until his arrest. His concession cements his connection to the phone. The discovery of the phone in his car also supports the inference that it was there during the offenses. Hence, Judge Collins reasonably could infer that the phone contained evidence of the offenses, because (1) it was recovered from defendant's car or, alternatively, (2) defendant carried it on his person and he was at the crime scene.

¶ 60    Defendant also concedes that, "had the officers discovered the defendant's phone in the car's back seat immediately following the offense, one could infer that evidence of a criminal offense might be found on the phone." Here, although the phone was not recovered until two days after the offenses, the complaint alleged facts from which Judge Collins could infer the phone's presence at the crime scene, either in the car or on defendant's person. A magistrate may draw reasonable inferences from the evidence set forth in a complaint for a search warrant. *Manzo*, 2018 IL 122761, ¶ 36.

¶ 61    Accordingly, we conclude that the record supports a reasonable inference that the phone was in the car during the commission of the offenses. Thus, we hold that the warrant was supported by probable cause to search the phone for GPS tracking data.

¶ 62    Defendant argues that, even if a search of the GPS data was supported by probable cause, the warrant was overbroad because it allowed a search of file locations containing video. The warrant clause of the fourth amendment categorically prohibits the issuance of any warrant except one "particularly describing the place to be searched and the persons or things to be seized." The particularity requirement is of heightened significance regarding computers, given the vast amount

of information they are capable of storing. *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013). The manifest purpose of the particularity requirement is to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications and will not take on the character of the wide-ranging exploratory searches the framers intended to prohibit.

> "Thus, the scope of a lawful search is 'defined by the object of the search and the places in which there is probable cause to believe that it may be found. Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase.' " *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (quoting *United States v. Ross*, 456 U.S. 798, 824 (1982)).

¶ 63    At the hearing on the suppression motion, defense counsel argued that "maybe the magistrate should have signed a search warrant that would allow for the search for GPS data, but definitely not for video files, definitely not for text messages, definitely not for phone calls because there is nothing in the complaint that says or even suggests phone calls would be made." Defendant renews the argument in his reply brief, proposing that, "even if the affiant had only sought permission to gather GPS coordinates from the defendant's phone, any subsequent collection of videos and photos would have been outside the scope of that warrant." He contends that "[s]eeking GPS coordinates cannot serve as a basis to search all throughout a phone's data." While we agree that probable cause to look for GPS data would not necessarily support a search of all of a cell phone's data (*cf.*, *People v. Prinzing*, 389 Ill. App. 3d 923, 937 (2009) (holding that police

exceeded the scope of their authorization to search the defendant's computer where the defendant consented to a search for viruses and the police searched for images)), we also do not believe that such a search must be strictly limited to GPS files. Courts across the country have addressed similar issues. We initially note that federal court decisions, like those of our sister states, are not binding. They may be persuasive authority and may be followed if the court believes that the analysis is reasonable and logical. *Werderman v. Liberty Ventures, LLC*, 368 Ill. App. 3d 78, 84 (2006).

¶ 64     In *United States v. Burgess*, 576 F.3d 1078 (10th Cir. 2009), the Tenth Circuit Court of Appeals considered whether the discovery of child pornography during the search of a computer hard drive authorized by a warrant allowing a search for evidence of drug trafficking exceeded the scope of the warrant. The images of child pornography were discovered while an officer was examining preview files looking for images of drug trafficking. *Id.* at 1084. The officer noted an image that depicted "child sexual exploitation." *Id.* He immediately closed the file and sought a second warrant authorizing him to search for evidence of child sexual exploitation. *Id.* Additional images were then discovered.[1] *Id.*

---

[1] To the extent that images could be discovered in "plain view" during a search for data covered by the warrant, we do not believe that an additional warrant authorizing a further search would be necessary. See *United States v. Karrer*, 460 F. App'x 157, 164 (3d Cir. 2012) ("In this case, the warrant authorized [the police officer] to access [the defendant's] cellular phone to search for evidence of unlawful communications with minors, and he did not violate the Fourth Amendment in arriving in the phone's photos folder. [Citation.] We reach this conclusion because we find no clear error in the District Court's implicit factual finding that cell phones often archive communications as image files, which may be saved in photos folders. Once [the officer] had

¶ 65    The *Burgess* court first determined that the warrant authorizing a search of "computer records" was not overbroad, because it was limited to such records that would reveal evidence of drug trafficking. *Id.* at 1091-92. The court then turned to the scope of the search. It noted that " 'a computer search may be as extensive as reasonably required to locate the items described in the warrant.' " *Id.* at 1092 (quoting *United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006)). Moreover, there is no requirement that a warrant direct " 'a particularized computer search strategy.' " *Id.* (quoting *United States v. Brooks*, 427 F.3d 1246, 1251 (10th Cir. 2005)). It was sufficient, the *Burgess* court concluded, that "the scope of this search was explicitly restrained by content"—that is, the search was limited to evidence of drug trafficking. *Id.* at 1093. In other words, the fourth amendment is not offended when an officer searches for the intended object of a warrant in a place that the object is reasonably likely to be found. See *People v. Economy*, 259 Ill. App. 3d 504, 512 (1994) ("In looking for items named in a search warrant, the officers are free to search anywhere the object of the search could reasonably be expected to be found."). Thus, in the context of computer files, this means that an officer may look for data in files where such data is reasonably stored.

¶ 66    Additional guidance for the resolution of this appeal can be found in *United States v. Stabile*, 633 F.3d 219 (3rd Cir. 2011). In that case, a police officer searched a hard drive pursuant

---

entered the photos folder, it was readily apparent that one image likely depicted a sexual offense against a child, and thus constituted child pornography, based on the sizes and characteristics of the hand and genitalia in the photo. The image located on [the defendant's] cell phone was therefore admissible under the 'plain view' exception, and the subsequently discovered evidence of child pornography did not require suppression.").

to a warrant authorizing him to look for evidence of financial crimes. *Id.* at 236. In the course of the search, he opened a folder labeled "Kazvid." "The folder contained files bearing names indicative of child pornography." *Id.* The officers opened the files and determined that they did, in fact, contain such material. *Id.*

¶ 67 The *Stabile* court first considered whether the officer could open the "Kazvid" folder pursuant to the warrant authorizing him to look for evidence of financial crimes. The officer testified that this folder could have contained financial information. *Id.* at 240. The court held that it was objectively reasonable for the officer to view the contents of the folder, "because criminals can easily alter file names and file extensions to conceal contraband." *Id.* at 239. It also noted the methodical manner in which the officer proceeded with the search, focusing on particular areas of the hard drive rather than generally examining its entire contents. *Id.*

¶ 68 The *Stabile* court next determined that the plain-view doctrine applied to the officer's observation of the contents of the "Kazvid" folder. It held that, because, as explained above, the officer was authorized by the warrant to open the "Kazvid" folder, he had "lawfully arrived at the point from which the evidence could be viewed." (Internal quotation marks omitted.) *Id.* at 242. Further, the incriminating nature of the evidence—the file names suggesting child pornography— was immediately apparent. *Id.* Finally, the warrant gave him a "lawful right of access." *Id.*

¶ 69 However, the *Stabile* court then noted that the trial court had found that the officer exceeded the scope of the warrant by actually opening the files with the lurid names. *Id.* It declined to address this issue, as it found that the independent-source and inevitable-discovery doctrines would apply and suppression would not be warranted. *Id.* This final issue does not arise in the present case because, as we will explain below, what was observed in plain view were actual images of the victim.

¶ 70    In *United States v. Dewald*, 361 F. Supp. 3d 413, 415 (M.D. Pa. 2019), the defendant was charged with sexual offenses directed against a minor. When he was arrested, the police seized a cell phone, and they also obtained a computer belonging to the defendant. *Id.* at 415-16. They secured warrants allowing them to look for communication between the defendant and the minor on the two devices. During the search of the cell phone, they discovered communications between the defendant and two additional minors. *Id.* at 416. The defendant argued that the communications with the additional minors were outside the scope of the warrant. *Id.* at 419. The court rejected this argument because, assuming that the warrant authorized the police to search only for communication between the defendant and the first minor, it nevertheless authorized them to search through the cell phone's messaging applications. *Id.* at 420. While doing so, the "lurid communications" between the defendant and the additional minors were in plain view. *Id.*; see also *Frasier v. State*, 794 N.E.2d 449, 463 (Ind. Ct. App. 2003) ("[The police officer] believed he was authorized to access the data on [the defendant's] computer to search for marijuana records and happened across images believed to be child pornography.").

¶ 71    We also note the relevance of *People v. Clendenin*, 238 Ill. 2d 302 (2010). In that case, a private citizen examined a compact disc containing computer files owned by the defendant. The private citizen viewed the titles of the files and watched a video clip. In the video clip, a minor girl engaged in sexual activity with an adult male. Some of the files had titles suggestive of child pornography. She turned the disc over to the police. *Id*. at 305-06. No issue existed regarding the initial search, as it was conducted by a private citizen. *Id.* at 330. The defendant argued that the police exceeded the scope of the initial, private search by not limiting their search to the same areas of the disc searched by the private citizen. *Id.* The supreme court rejected the defendant's claim. *Id.* It first observed that the private citizen's "own search was of sufficient scope to allow

police to perform a general review of the files on the disc for the presence of child pornography." *Id.* It then expressly noted, "Defendant has pointed to nothing in support of the claim that [the police] searched anywhere on the disc that by its file name likely would not contain child pornography." *Id.*

¶ 72    In this case, as we explain above, probable cause existed to search defendant's cell phone for GPS data. The question then becomes whether that allowed the police to access defendant's video files. Relevant here is the testimony of Gudbrandsen, the cyber-crimes forensic analyst who searched defendant's cell phone. Pursuant to the warrant, Gudbrandsen was authorized to, *inter alia*, look at areas of the cell phone that could contain GPS data. Gudbrandsen testified that, regarding video files, "sometimes there's maps or video or locations, in accordance with the GPS." Also, the complaint implicitly characterized video files as potential sources of GPS data. The complaint explained that a GPS device "allow[s] users, for example, to view their tracks, project their tracks on satellite images or other maps, annotate maps, and tag photographs with the geolocation." Thus, the record indicates that video files were a place where it would be reasonable to look for GPS data and thus authorized by the warrant. See *Burgess*, 576 F.3d at 1092. As she examined the video files, Gudbrandsen, who was aware of the details of the investigation, noted "[i]mages of a little three-year-old girl and [the] date fit the time and date of the events that [she] was informed of by the investigation." In other words, being in a virtual place in which she was entitled to be in accordance with the warrant, Gudbrandsen observed these photographs in plain view. See *Stabile*, 633 F.3d at 242. Given her knowledge of the case, their incriminating nature was immediately apparent. See *People v. Lee*, 2018 IL App (3d) 160100, ¶ 16 (holding that the "immediately apparent" criterion is satisfied if there is probable cause to believe that the item in plain view is incriminating).

¶ 73    Parenthetically, we do not find it particularly significant that Gudbrandsen's testimony that video files could contain GPS data was not included in the complaint or presented to Judge Collins. As noted in *Burgess*, 576 F.3d at 1093, it is permissible for a warrant's scope to be governed by the nature of the items to be searched for—here GPS data—without precise specification of file names or locations. The *Burgess* court aptly observed, "It is unrealistic to expect a warrant to prospectively restrict the scope of a search by directory, filename or extension or to attempt to structure search methods—that process must remain dynamic." *Id.* Similarly, in *Stabile*, 633 F.3d at 240, the court credited the testimony of the officer performing the search that the folder in question was of a sort that could contain evidence of financial crimes, which the warrant was directed toward. Here, the warrant was sufficiently particular in authorizing a search for GPS data; thus, it was not necessary for the warrant to specify each individual file that was subject to search. *Cf. United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984) ("Courts tend to tolerate a greater degree of ambiguity [in a warrant] where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant."). Gudbrandsen's testimony that such data might be found in video files is helpful but not indispensable in determining whether the search exceeded the scope of the warrant.

¶ 74    We therefore hold that probable cause existed for the police to examine the video files on defendant's cell phone and that the images Gudbrandsen encountered of the victim were in plain view. Thus, there was a sufficient nexus between defendant's cell phone and the underlying offenses.

¶ 75                                              2. Good Faith

¶ 76   Though we have concluded that the warrant was supported by probable cause, we will comment briefly on the State's alternative basis for affirmance: good faith. For suppression to be an appropriate remedy, it is necessary that the officers involved were not acting in good faith. See *People v. LeFlore*, 2015 IL 116799, ¶¶ 24-25. Our supreme court has explained, "Even if one assumes a want of particularity in the affidavits, the agents' reasonable and good-faith belief, although a possibly mistaken one, that the searches were authorized under the warrants, insulated the searches from a motion to suppress." *Stewart*, 104 Ill. 2d at 477. Moreover, "a police officer's decision to obtain a search warrant 'is *prima facie* evidence that he was acting in good faith.' " *People v. Bryant*, 389 Ill. App. 3d 500, 525 (2009) (quoting *United States v. Peck*, 317 F.3d 754, 757 (7th Cir. 2003)). Generally, good faith does not exist where a "magistrate simply rubber-stamped the warrant application, the officers were dishonest or reckless in preparing the affidavit, or the warrant was so lacking in probable cause that no officer could have relied on it." (Internal quotation marks omitted.) *Id.* This is an objective inquiry, focused on whether "a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances" (*United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)) rather than the subjective mental state of a given officer (*Herring v. United States*, 555 U.S. 135, 145 (2009)).

¶ 77   Defendant argues that there is nothing in the record from which a reasonable officer could infer that the cell phone was connected to the offenses listed in the complaint. We disagree. It is inferable that the cell phone, which was found in the vehicle used in the offenses, was present when the offenses were committed, and it is a device capable of GPS tracking and recording audio and video. Hergott reasonably presented this information to Judge Collins for a determination of whether this link was sufficient.

¶ 78    Here, defendant admitted to the police that the vehicle was his. In *Manzo*, the connection between the offenses and the targeted residence was more tenuous—two drug sales were merely near the house, the seller was observed leaving the house shortly before one sale, and the seller used a vehicle registered to a resident of the house. *Manzo*, 2018 IL 122761, ¶ 37. Moreover, as noted, *Manzo* is not directly analogous, as it involved a residence. See *id.* ¶ 35.

¶ 79    Further, defendant points out that the complaint contained much irrelevant detail. For example, it included information about the phone's data storage and Internet capabilities: "Electronic files received or created using a cell phone can be stored for years at little or no cost" and "files that have been viewed via the Internet can be recovered on the service provider's server based on history of usage and time of creation." None of this has any apparent relevance to this case. It also included a lengthy discussion of how computer technology has affected the production and distribution of child pornography, even though the child pornography counts were not added until after the search.

¶ 80    The extraneous detail in the complaint suggests to defendant that the warrant was cut-and-pasted from past warrants. We reject the notion that the extra information indicates a lack of good faith. Where an officer is "dishonest or reckless in preparing the affidavit," good faith is lacking, but nothing in Hergott's affidavit suggests recklessness or dishonesty. Indeed, defendant does not claim that any of the officer's assertions are demonstrably false. See *Bryant*, 389 Ill. App. 3d at 525.

¶ 81    Defendant cites *People v. Lenyoun*, 402 Ill. App. 3d 787, 795 (2010), for the proposition that it is bad faith for "officers [to] essentially cut and paste information from a prior authorized warrant to a second warrant application for a separate residence without adding any new information connecting the new residence to the criminal offense." In *Lenyoun*, two search

warrants contained similar information but targeted different places. The court rejected the second warrant because the content was unrelated to its target, not because the content had been copied from the earlier warrant. See *id.* at 796. Even if we were to assume that the descriptions of the handheld technology in this case were taken from another warrant, many details of defendant's conduct were added, including eyewitness accounts and the discovery of the devices in the vehicle used in the offenses. *Lenyoun* is factually distinguishable.

¶ 82    We recognize that the law surrounding the search of devices like smart phones, computers, and tablets is recent and developing. However, we find that the officers' actions in this case with regard to searching defendant's cell phone were clearly taken in good faith. Quite simply, it was inferable that the phone was at the crime scene collecting GPS data, and the officers quite reasonably sought a judicial determination as to whether this constituted probable cause.

¶ 83                              B. One-Act, One-Crime

¶ 84    Defendant was convicted of two counts of child pornography. The first count (count IV) alleged that defendant "filmed or videotaped or otherwise depicted *** said child *** engaged in any act of sexual penetration with any person in that there was a penis on the vagina of' the victim." The second (count V) alleged that defendant "filmed or videotaped or otherwise depicted *** said child *** in that the video depicts the unclothed vagina of' the victim." Both depictions occur in a single, three-minute long recording. Though this issue was not properly preserved, one-act, one-crime issues fall within the second prong of the plain-error doctrine. *People v. Nunez*, 236 Ill. 2d 488, 493 (2010). Review is *de novo*. *Id.*

¶ 85    Defendant asserts that one of these counts must be vacated in accordance with one-act, one-crime principles. The supreme court discussed the one-act, one-crime rule in *People v. King*, 66 Ill. 2d 551, 566 (1977):

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered."

A court must consider whether a conviction arose from a single physical act, and, if it did not, the court must then consider whether any of the offenses are lesser included offenses. *People v. Coats*, 2018 IL 121926, ¶ 12. Defendant's argument is directed to the initial inquiry.

¶ 86    In *Nunez*, 236 Ill. 2d at 494, the supreme court held, "Multiple convictions are improper if they are based on precisely the same physical act." In *People v. Hagler*, 402 Ill. App. 3d 149, 153 (2010), the court explained, "When a common act is part of both offenses, or is part of one offense and the only act of another, multiple convictions can still stand." Here, while there is certainly a common act—recording—defendant produced two distinct pornographic images by recording the victim's vagina and a penis touching the victim's vagina. Either act, standing alone, would support a conviction. See *King*, 66 Ill. 2d at 566 (" 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense."). That these were closely related acts does not implicate one-act, one-crime principles. *People v. Priest*, 297 Ill. App. 3d 797, 802 (1998) (citing *King*, 66 Ill. 2d at 566).

¶ 87    Accordingly, defendant's argument on this point lacks merit.

¶ 88                              IV. CONCLUSION

¶ 89    In light of the foregoing, the judgment of the circuit court of Lake County is affirmed.

¶ 90    Affirmed.

¶ 91    PRESIDING JUSTICE BIRKETT, specially concurring:

¶ 92    I agree with my colleagues that Hergott's complaint for a search warrant established probable cause to search defendant's cell phone for GPS data. I write separately because I believe that the complaint, together with commonsense inferences and matters of common knowledge, established probable cause to search the cell phone for images capturing the sexual assault of M.G. or of other children engaging in sexual activity.

¶ 93    The majority recites some of the principles governing our review. We should also keep in mind the following principles. While we are reviewing the trial court's denial of defendant's motion to suppress evidence, the focus of our analysis is Judge Collins's decision that Hergott's complaint set forth probable cause to search the video files in defendant's cell phone. We owe great deference to Judge Collins's decision. See *Illinois v. Gates*, 462 U.S. 213, 236 (1983). The issuing judge's task is to analyze the information contained in the affidavit, consider the type of crime being investigated, and make a "practical, common-sense decision" as to whether the reasonable inferences from those facts establish a "fair probability" that evidence of a crime will be found in a particular place. *Id.* at 238. "A search warrant's description is sufficient if it enables the officer executing the warrant, with reasonable effort, to identify the place to be searched." *People v. McCarty*, 223 Ill. 2d 109, 149 (2006). Courts should not invalidate warrants by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. *People v. Thomas*, 62 Ill. 2d 375, 380 (1975); *People v. Batac*, 259 Ill. App. 3d 415, 422 (1994). In

considering a defendant's challenge to a search warrant, we must bear in mind the presumption that the search warrant was valid. *People v. Lucente*, 116 Ill. 2d 133, 153 (1987). As the majority notes (*supra* ¶ 49) we must presume that Hergott's statements in his affidavit are true. *People v. McCoy*, 135 Ill. App. 3d 1059, 1065 (1985). When there is no direct information to establish a nexus between the place to be searched and the offense, "reasonable inferences may be entertained to create this nexus." *Id.* at 1066 (citing 1 Wayne R. LaFave, Search and Seizure § 3.7(d), at 706 (1st ed. 1978); *People v. Beck*, 306 Ill. App. 3d 172, 179 (1999); *People v. Teague*, 2019 IL App (3d) 170017, ¶ 11. "The test for probable cause is not reducible to 'precise definition or quantification.' " *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). " 'Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of evidence *** have no place in the [probable-cause] decision.' " *Id.* at 243-44 (quoting *Gates*, 462 U.S. at 235). All that is required is a "fair probability" on which "reasonable and prudent [people], not legal technicians, act." (Internal quotation marks omitted.) *Id.* at 238. In making a probable cause determination, the evidence " 'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " (Internal quotation marks omitted.) *People v. Jones*, 215 Ill. 2d 261, 274 (2005) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). "Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Place*, 462 U.S. 696, 701 (1983).

¶ 94    While the law requires judges to be neutral, in evaluating probable cause, judges may consider what " 'is or should be common knowledge.' " *United States v. Reichling*, 781 F.3d 883, 887 (7th Cir. 2015) (quoting *United States v. Seiver*, 692 F.3d 774, 778 (7th Cir. 2012)); see *People v. Jones*, 31 Ill. 2d 42, 48 (1964). "[I]n a case involving possible evidence of child pornography or sexual exploitation of a child, the probable cause inquiry 'must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology.' " *Reichling*, 781 F.3d at 887 (quoting *United States v. Carroll*, 750 F.3d 700, 704 (7th Cir. 2014)). The United States Supreme Court has repeatedly cautioned that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Gates*, 462 U.S. at 236.

¶ 95    The defendant has the burden of proof to establish that the police conducted an illegal search of his cell phone, specifically the video files. 725 ILCS 5/114-12(b) (West 2012); *People v. Cregan*, 2014 IL 113600, ¶ 23; *People v. Wells*, 273 Ill. App. 3d 349, 351 (1995). "If the defendant makes a *prima facie* showing that the evidence was obtained in an illegal search or seizure, the burden shifts to the State to provide evidence to counter the defendant's *prima facie* case." *Cregan*, 2014 IL 113600, ¶ 23. The ultimate burden of proof remains with the defendant, however. *Id.*

¶ 96    The essence of defendant's argument during the motion-to-suppress hearing was defense counsel's remarks that "[n]ot a single witness states that a cell phone was used in the commission of the offense" and that it was "actually incredibly rare" for someone to tape an assault. These assertions do not come close to establishing a *prima facie* case that Hergott's complaint failed to establish a nexus between the cell phone's video files and the crime against M.G. Defendant's arguments are refuted by reams of scholarship, case law, common knowledge, and common sense.

¶ 97    As the United States Supreme Court observed in *Riley v. California*, 573 U.S. 373 (2014), cell phones are used to capture intimate activity every day by millions of Americans. "Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.' " *Id.* at 403 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

¶ 98    My colleagues do not discuss the two cases defendant relies on to argue that there was no nexus to search the video files. Since I believe that Hergott's affidavit established probable cause to search the video files, I must address the cases. See *Siegel v. Levy Organization Development Co.*, 153 Ill. 2d 534, 544 (1992) ("it is imperative that reviewing courts set forth their rationale and discuss the relevant case law pertaining to the issues in a given case").

¶ 99    At oral argument, defense counsel argued that defendant's possession of a cell phone "in and of itself" was insufficient to justify the search of said phone. Counsel argued that "all the recent cases," all federal cases, support this proposition. Defense counsel pointed to a case that he did not cite in his briefs, *United States v. Ramirez*, 180 F. Supp. 3d 491 (W.D. Ky. 2016).[2] Nevertheless, as the State did not raise an objection, I will consider *Ramirez*. Federal court decisions, like those of our sister states, are not binding. They may be persuasive authority and may be followed if the court believes that the analysis is reasonable and logical. *Werderman v. Liberty Ventures, LLC*, 368 Ill. App. 3d 78, 84 (2006).

---

[2] Failure to seek leave of court to cite additional authority deprives both opposing counsel and this court from adequately preparing for oral argument. Counsel is cautioned to comply with Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) ("[p]oints not argued are forfeited and shall not be raised *** in oral argument") in the future.

¶ 100   Ramirez was arrested for conspiracy to possess with intent to deliver a large quantity of marijuana. He possessed a cell phone when he was arrested. The affidavit sought to search "all personal files and information stored within the cell phone, to include text messages, phone contacts, and pictures." *Ramirez*, 180 F. Supp. 3d at 492. The affiant checked a box that stated that there was " 'probable cause' " to believe that the phone contained evidence of " 'a crime.' " *Id.* The affiant also stated that he knew through his training and experience that "individuals may keep text messages or other electronic information stored in their cell phones which may relate them to the crime and/or co-defendants/victim." *Id.* at 493. The United States District Court for the Western District of Kentucky stated that, "[w]ithout any additional detail tying Ramirez's arrest to his cell phone, this boilerplate statement is insufficient to establish the particularized facts demonstrating fair probability that evidence of a crime will be located on the phone." *Id.* at 494. Even though the affiant's experience may be considered in determining probable cause, "it cannot substitute for the lack of evidentiary nexus." (Internal quotation marks omitted.) *Id.* at 495.

¶ 101   In the instant case, Hergott's complaint for a search warrant did not suffer from the lack of evidentiary detail as was the case with the affidavit in *Ramirez*. As the district court in *Ramirez* noted in a footnote, the affidavit did not include the word "charge," did not mention a complaint filed against Ramirez on May 17, 2013, or the indictment issued the same day the search warrant was issued, or cite the statute Ramirez was accused of violating. *Id.* at 494 n.4. The date or dates during which Ramirez engaged in the conspiracy were not mentioned. The district court noted that the only information "indicating any likelihood that evidence of a crime might be found" was the fact that Ramirez was arrested while possessing the phone. *Id.* at 495. I also note that child molestation and child pornography are crimes that are, by their nature, solitary and secretive crimes. See *State v. Brennan*, 674 N.W.2d 200, 206 (Minn. Ct. App. 2004).

¶ 102   In the instant case, Hergott's affidavit was seven pages in length and contained detailed facts concerning the abduction, the injury to M.G.'s vagina, M.G.'s emotional state, and the recovery of the cell phone, media player, GPS device, and lotion inside defendant's vehicle, which was the likely scene of the sexual assault. The affidavit detailed Hergott's 23 years of experience as a police officer, including "training in the area of child sexual abuse/assault/exploitation, and training in the area of computer crimes involving children." Hergott explained that "cellular phones and cellular phone technology" have revolutionized the way photographs are "viewed, produced, distributed, stored, and utilized." He discussed the behavior of people who view, produce, distribute, and utilize child pornography. He stated that individuals who collect and trade child pornography keep the images "for long periods of time, so the individual can view these images at his discretion." In his reply brief, defendant states that Hergott "wanted to search the phone for videos, photographs, and internet searches." Defendant argues that we should disregard the State's argument that, from the facts, it is fair to infer that defendant planned the offense.

¶ 103   At oral argument, defense counsel argued that the details provided in the warrant were not enough to establish the nexus element of probable cause. He argued that the warrant was "bare bones" as to the cell phone. Defense counsel conceded that several questions arise from the four corners of the warrant, such as: "Who abducted M.G.? Where was she taken? Who sexually assaulted M.G? Why did this occur?" Counsel said, "[e]xactly, and you need to put that in the warrant." I disagree. These are commonsense inferences from which Judge Collins could determine that a nexus existed to search the cell phone to find answers to these questions. An issuing judge has the authority to draw reasonable inferences from the information supplied to him or her. *Gates*, 462 U.S. at 240. Requiring an affiant to document every reasonable inference is the

type of hypertechnical *de novo* review that we must avoid in reviewing the sufficiency of an affidavit.

¶ 104   Defendant cited a single case, *People v. Zimmerman*, 277 F.3d 426 (3d Cir. 2002), for the proposition that the mere fact that a person has been accused of child molestation does not provide probable cause to search for child pornography. Zimmerman was a high school teacher and coach charged with sexually abusing several boys on the basketball team. Zimmerman had shown a video clip of adult pornography to several students. *Id.* at 430. The police obtained a search warrant authorizing the search of Zimmerman's computer and computer-related equipment for " 'any sexual materials,' " including " 'images of humans in sexual contact with animals or other prohibited sexual acts.' " *Id.* at 431. The warrant included child pornography as one of the crimes that Zimmerman was suspected of committing. Child pornography was recovered on Zimmerman's computer, and he was charged with child pornography (18 U.S.C. § 2252A(a)(5)(B) (Supp. IV 1999)). *Zimmerman*, 277 F.3d at 431. Zimmerman's motion to suppress was denied. He entered a conditional plea of guilty, preserving the right to appeal the issue of probable cause. The circuit court reversed the district court, noting that the government conceded that there was no information that Zimmerman had ever purchased or possessed child pornography. *Id.* at 429. There was, however, information in the affidavit that " 'persons who have sexual interest or sexual contact with children may often collect images, pictures, photos or other visible depictions of children, or of children depicted in sexually explicit positions.' " *Id.* at 433. The court said that there was no information "indicating that child pornography was—or ever had been—located" in Zimmerman's home. *Id.* It also rejected the government's argument that the search for the adult pornography was proper and that the discovery of the child pornography was "discovered incident to a legal search." *Id.* at 433-34. The circuit court concluded that the information about the adult

pornography, a video of a woman having sex with a horse, was stale. Information from six and ten months earlier stated that Zimmerman had shown the video, but there was no information that it was ever "downloaded from the computer on which the boys allegedly viewed it." *Id.* at 434. The court also rejected the government's "good faith" argument, stating that it was " 'entirely unreasonable' " for an individual to believe that there was the "requisite indicia of probable cause." *Id.* at 437.

¶ 105 Judge Alito dissented. He discussed the state's charges that were pending against Zimmerman. Judge Alito noted that the affidavit submitted in support of the search warrant application "set out ample evidence supporting these charges." *Id.* at 438-39 (Alito, J., dissenting). Some of the incidents had taken place in Zimmerman's home, and he "had shown sexually explicit materials to minor students." *Id.* at 439. Judge Alito stated that "[t]he warrant authorized a search for evidence of the offenses with which the defendant was charged and related crimes involving victimization of minors." *Id.* He would have found that the search warrant was not stale, because it was probable that the video clip of the woman having sex with a horse was downloaded to the computer's hard drive. The clip had been shown to minors repeatedly. *Id.* at 439-40. Judge Alito stated that the affidavit "showed that the defendant had a sexual interest in minors and that he had used sexual materials on several occasions as part of his course of conduct. All of this information tends to support a finding of probable cause." *Id.* at 440. Judge Alito also disagreed with the majority's rejection of the government's "good faith" arguments under *United States v. Leon*, 468 U.S. 897 (1984). Judge Alito noted that there is no "bright line between fresh and stale probable cause." *Zimmerman*, 277 F.3d at 440. As I explain below, I agree with Judge Alito's dissent in *Zimmerman*.

¶ 106  At oral argument here, defense counsel stated that he could find only one case that disagreed with the holding in *Zimmerman*. Counsel said that it was a California case, but he did not provide the name of the case or a citation. From my research, I discern that counsel was referring to *People v. Nicholls*, 71 Cal. Rptr. 3d 621 (Ct. App. 2008). In *Nicholls*, Nicholls was accused of molesting his 10-year-old daughter, who lived with her mother. The abuse lasted several months. A search warrant was executed on Nicholls's computer and laptop bag. The police recovered "10,000 still images and 47 movie files of child pornography on the hard drives of defendant's computer." *Id.* at 623. The affidavit of the police detective detailed his 17 years of experience, including training in "child abuse and sexual assaults." *Id.* It also detailed the victim's description of the sexual molestation but did not reveal the use of a computer or a cell phone or the use of pornography during the sexual molestation. *Id.* at 623-24. The affidavit stated that the defendant had turned himself in to the police. He had been staying with his mother prior to turning himself in. In a brief recorded phone call, the defendant told his mother that he had stored his computer in the garage attic and asked, " 'is it OK up there?' " Nicholls's mother said that it was " 'All right.' " He told her he did not want " 'anybody messing with, um, with the paperwork and stuff I have in there.' " The affidavit stated how, based on the affiant's training and experience, he knew that child pornography is used by people who molest children. *Id.* at 624. In summary, the affidavit stated that, generally, people who molest children exhibit the following characteristics: they (1) receive sexual gratification from child pornography; (2) collect sexually explicit materials for sexual gratification; (3) use pornography to lower children's inhibitions; (4) rarely discard the material, especially when used to seduce victims; (5) share information and support with other molesters; (6) rarely destroy the correspondence; (7) use pornography to relive fantasies or actual encounters; (8) go to great lengths to conceal and protect their pornography from discovery;

(9) often correspond with others who share their interests, via computerized bulletin boards; (10) keep diaries of their sexual encounters with children; (11) collect and maintain material on the subject of sex with children, which they use to seduce children; (12) often keep mementos, like a child's underwear; and (13) collect and store digital images of their victims and, if they take a photo of a victim in the nude, there is a high probability that the child was molested. *Id.*

¶ 107   Nicholls moved to suppress the evidence found on his computer and hard drive. He argued that the police left out of the affidavit that in his phone call to his mother he also expressed concern about his clothing, so the commonsense conclusion was merely that he was concerned about his belongings. He argued that there was nothing to indicate a fair probability that any child pornography would be found on his computer, because "there was no indication that defendant ever showed the victim any pornography, and to the contrary the child said she was not shown any images." *Id.* at 625. He argued that the fact that he was charged with "lewd and lascivious conduct is a bare conclusion which does not constitute probable cause." *Id.* The trial court denied the motion to suppress. Nicholls entered a "no contest" plea to all charges and was found guilty on all counts.

¶ 108   On appeal, Nicholls argued that the affidavit was "deficient because it (1) did not indicate he used the laptop or any computer or computer-related media in the alleged molestation of his daughter, (2) did not indicate he used child pornography in the alleged molestation, and (3) did not indicate he expressed any general interest in receiving or transmitting child pornography, through the computer or otherwise." *Id.* at 629. The court of appeals rejected Nicholls's argument that it should disregard the phone call and the expert opinion about the habits of child molesters. *Id.* The court noted that the warrant application did not depend solely on the affiant's opinion about activities of child molesters. The affidavit also contained the victim's statements and Nicholls's

concern about his computer. *Id.* The court also distinguished *Zimmerman*, "where the government conceded there was no probable cause to search for child pornography." (Emphasis omitted.) *Id.* at 630-31 (citing *Zimmerman*, 277 F.3d at 432). The court also disagreed with other out-of-state cases cited by Nicholls, like *Burnett v. State*, 848 So.2d 1170 (Fla. Dist. Ct. App. 2003). The court disagreed with the Florida Appellate Court's failure to "give weight to the affidavit for reasons other than the lack of qualifications of the expert." *Nicholls*,  Cal. App. 4th at 715. The court declined to comment on "research studies about child molesters, which are not part of the record." *Id.*

¶ 109   Contrary to defendant's argument, *Nicholls* is not the only case that disagrees with *Zimmerman*. In fact, there is a significant body of case law from the federal district and circuit courts, as well as from our sister states, discussing the connection between child molestation and child pornography. Before discussing those cases, I will examine the probable cause determination in other types of cases where, like here, there is no independent evidence that the cell phone was used in the commission of the offense.

¶ 110   I begin with *Johnson v. State*, 2015 Ark. 387, 472 S.W.3d 486, from the Supreme Court of Arkansas. Johnson was a suspect in a murder committed during an aggravated robbery. Johnson and his codefendant were arrested during a traffic stop. Johnson had a cell phone on his person when he was arrested. The police secured the phone but did not search it. Nearly two years later, the police obtained a warrant to search the contents of Johnson's phone. The affidavit set out the details of the crime and the fact that Johnson had a cell phone on him at the time. The affidavit also stated that the codefendant implicated himself and Johnson. *Id.* at 6. There was no information in the affidavit about the cell phone other than the affiant's belief that "said phone contains possible evidence regarding the *** homicide." *Id.* at 5. The supreme court noted that the cell phone was

recovered from Johnson "approximately twenty-hours after the homicide." *Id.* at 6. The court said that, because another person was involved, it was "reasonable to infer" that the cell phone was used to communicate with others "before, during, or after" the murder. *Id.* The court also noted that a confidential informant tipped off the police and it was therefore reasonable to infer that Johnson communicated with some third party regarding his involvement. *Id.* "Based on these facts, it is reasonable to conclude that the phone may have been used as a communication device regarding the homicide." *Id.* at 7. The court held that there was adequate probable cause to issue the search warrant.

¶ 111    *Hedgepath v. Commonwealth*, 441 S.W. 3d 119 (Ky. 2014), from the Supreme Court of Kentucky, is another murder case involving the search of a cell phone pursuant to a warrant. On January 17, 2010, Hedgepath called 911 and reported that the victim, his girlfriend, would not wake up. Hedgepath told the police at the scene that the victim's ex-boyfriend had come over when he was gone and had beaten her. Hedgepath left to take the victim's two children to the hospital but never arrived there. Instead, he took them to the victim's relatives. A detective tried to reach Hedgepath on his cell phone. Based on cell data, the police found Hedgepath's vehicle at an apartment complex. At about the same time, Hedgepath called the state police and agreed to come in for an interview. During the interview, Hedgepath denied beating the victim and said that his "cell phone" could confirm that he was not at the apartment when the victim was beaten. *Id.* at 122. He claimed that, when he arrived at the victim's apartment the night before the murder, the victim told him that a man named "Bobby" had beaten her. He told the police that, before leaving the apartment, he and the victim "had a meal together and then engaged in consensual anal, vaginal, and oral sex." *Id.* The police arrested Hedgepath after the interrogation ended. The police seized Hedgepath's cell phone from his vehicle and eventually secured a warrant to search the vehicle

and its contents, including his cell phone. *Id.* at 122, 130.[3] Videos of Hedgepath's rape and beating of the victim were recovered from the cell phone. *Id.* at 123. The trial court denied Hedgepath's motion to suppress evidence seized from the cell phone.

¶ 112   On appeal, Hedgepath argued that the search warrant for his cell phone was insufficient because it did not describe the contents of the phone to be searched. *Id.* The court noted that, while the warrant did not limit the parts of the phone that could be searched or the type of data or files to be sought, the clear thrust of the warrant was for evidence related to the sexual assault committed on the victim. The warrant allowed the police to search " 'all places in size where any of the above described personal property may be stored, hidden, and/or concealed,' " " 'including but not limited to all electronic equipment, computers, and all phones.' " *Id.* at 130. As in the instant case, the search revealed evidence of Hedgepath's sexual assault of the victim, not evidence of some other crime. *Id.* at 131. The court noted that, in *Riley*, the Supreme Court held that, while a search warrant is generally required to search a cell phone, its " 'holding, of course, is not that information on a cell phone is immune from search.' " *Id.* at 130 (quoting *Riley*, 573 U.S. at 401). Although the Kentucky supreme court  discussed the particularity requirement of the fourth amendment, the court specifically found that the search warrant authorized the search and seizure of the videos of the rape and beating of the victim from Hedgepath's cell phone. *Id.* The court said, "[t]his was not a warrantless search of the sort condemned in *Riley*." *Id.*

---

[3] Hedgepath claimed that the seizure and search of the cell phone was the fruit of the poisonous tree because the police did not get a warrant to get the GPS data from AT&T. The court rejected this argument because Hedgepath drove himself to the interview. Any taint was attenuated. *Hedgepath*, 441 S.W.3d at 126.

¶ 113    In *Moats v. State*, 148 A.3d 51, 54 (Md. Ct. Spec. App. 2016), the Court of Special Appeals of Maryland upheld the search of a cell phone for "evidence related to the drug offenses and the sexual assault of" a minor. In the affidavit in support of the search warrant, the affiant said that he met with the victim at the hospital. She told the affiant that she was riding in a car with Moats and another male. While out riding, they stopped, and Moats supplied each of them with "suboxone." They were all under the age of 18. The victim said that she ended up at a party but could not "remember where the party was at and [did] not know who sexually assaulted her." She said that she was " 'high' " and that, at some point, she "used heroin as well." The affidavit stated that Moats was interviewed. He admitted supplying suboxone and marijuana but "denied any knowledge and/or involvement with the sexual assault." The other occupants of the vehicle were interviewed and denied knowledge of the sexual assault but stated that, when the victim got into the vehicle, she said that " 'she was sexually assaulted the night before at a party.' " *Id.* at 54-55. The affidavit went on to state that "['[y]our Affiant knows through his training and experience as a Criminal Investigator that individuals who participate in such crimes communicate via cellular telephones, via text messages, calls, e-mails, etc.' " *Id.* at 55. The warrant sought to search Moats' cell phone for evidence of the sex offense and the drug offenses. A search of the phone recovered sexually explicit photos and a video of a young woman who turned out to be Moats's then 15-year-old girlfriend. *Id.* Moats was charged with three counts of possession of child pornography and one count of second-degree assault. The trial court denied Moats's motion to suppress the search of his cell phone. *Id.*

¶ 114    On appeal, Moats argued that the application for the search warrant " 'did not provide any nexus between the alleged criminal activity and the phone.' " *Id.* at 56. The court stated that "[c]ertainly, from our case law, it is clear that individuals use their cell phones to document all

kinds of criminal behavior on a rather regular basis and that data recovered from cellular phones is frequently admitted as evidence of guilt in criminal trials." *Id.* at 59. The court stated that the police acted properly in seizing the cell phone incident to Moats's arrest and then subsequently obtaining a search warrant, thus complying with "the Constitution and Article 26 of the Maryland Declaration of Rights." *Id.* (citing *Riley*, 573 U.S. at 388).

¶ 115   The court held that direct evidence that Moats's phone contained data that was relevant to proving his involvement in the alleged offenses was unnecessary. "[P]robable cause may be inferred from the type of crimes, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items." (Internal quotation marks omitted.) *Id.* at 61. The court concluded that the affiant's averments, together with other evidence in the affidavit, "was sufficient to provide a common-sense nexus between the offenses Moats was accused of committing and the phone to be searched." *Id.* at 62. Alternatively, if the warrant judge did not have a substantial basis to issue the warrant, the court would have found that the good-faith exception allowed the admission of the evidence seized from the cell phone. *Id.*

¶ 116   The same day *Moats* was filed, the Court of Appeals of Maryland filed its opinion in *Stevenson v. State*, 168 A.3d 967 (Md. 2017). There, the initial police investigation focused on a man found "lying on the ground, with a bloodied face, his pants around his ankles, and no wallet or shoes" outside a Moose Lodge on July 22, 2015. The victim had life threatening injuries. *Id.* at 971. Stevenson was arrested in a separate assault and robbery on July 23, 2015. He had the victim's wallet and shoes. The police also seized Stevenson's cell phone from his person. A detective sought and received a search warrant to search Stevenson's cell phone for " '[e]lectronic communications information' " stored on the cell phone pertaining to the assault and robbery of

the victim. *Id.* at 972. The search produced six photographs of the victim just after the assault and robbery. Stevenson filed a motion to suppress. Before there was a hearing, the detective prepared a second warrant application and affidavit, containing the same language, "save for the requested scope of the search of the cell phone and [Stevenson's] acknowledgment that the cell phone belonged to him." *Id.* The affiant stated that he believed " 'through [his] knowledge and experience that suspects in robberies and assaults will sometimes take pictures, videos and send messages about their criminal activities on their cellular phones.' " *Id.* The affidavit for the second warrant sought more than "electronic communications," and it was presented to a different judge from the judge who issued the first warrant. The affidavit made no reference to the first warrant or the recovery of the six photographs.

¶ 117    The parties agreed that the motion to suppress applied to the second warrant. *Id.* at 973. Stevenson maintained that the affidavit lacked "specific facts connecting the crime and the cell phone." The State responded that "it is now 'common knowledge' that people take pictures and videos on their cell phones of the crimes they commit." *Id.* The State also emphasized that Stevenson admitted that he assaulted the victim. *Id.* Stevenson was convicted following a bench trial.

¶ 118    On appeal, Stevenson argued that the "warrant affidavit failed to provide a nexus between the crime alleged and the 'place' the police sought to search." *Id.* at 974. He also argued that the "good faith" exception to the probable-cause requirement did not save the photos from exclusion, because no reasonable officer would have grounds to believe that the warrant was properly issued "upon the notion that people who commit crimes 'sometimes' have evidence of such crimes on their cell phones." *Id.* The court, citing *Gates*, stated that "[t]he Supreme Court has observed that probable cause may be based on 'common-sense conclusions about human behavior.' " *Id.* at 975

(quoting *Gates*, 462 U.S. at 231). The court concluded that the issuing judge had a substantial basis for finding probable cause to search the cell phone for " '[a]ny and all information, including but not limited to all pictures, movies, electronic communications in the form of text, numeric, and voice messages, detailed phone records to include all incoming/outgoing calls and Facebook messages contained within [the] phone." *Id.* at 976. The court took into account the historical facts, the affiant's statement that suspects " 'sometimes take pictures, videos and send messages,' " as well as the Supreme Court's "recognition of the prevalence of cell phones in the population and the degree of detail of one's daily life that is often contained in a cell phone." *Id.* (citing *Riley*, 573 U.S. at 394-95). Like defendant's argument in the instant case, Stevenson argued that the affidavit did not set forth any direct evidence that the cell phone contained evidence of the crimes of which he was accused. Citing *Moats*, the court stated that direct evidence has never been required by the fourth amendment. *Id.* (citing *Moats*, 148 A.3d at 60). Stevenson further argued that the word "sometimes" in the affidavit is " 'so generalized that it could provide the basis for a search on suspicion of any offense, undermining the substantial protections for cell phones recognized in *Riley*.' " *Id.* at 976-77. While the court recognized and accepted the privacy interest in cell phones discussed in *Riley*, it stated that "[t]he *Riley* Court did not even intimate, much less state, that simply because cell phones hold a 'broad array' of information, a search warrant cannot issue." *Id.* at 977 (quoting *Riley*, 573 U.S. at 397). The court interpreted the affiant's use of the term "sometimes" under oath to mean "more than 'rarely' and less than 'more often than not.' " *Id.* The court also said, "[w]e bear in mind, as well, that the warrant affidavit sought only such information as was stored within the eighteen-hour period encompassing the time when [Stevenson] assaulted and robbed [the victim]." *Id.* at 978. The court also considered the Supreme Court's statement in *Riley* that " 'more than 90% of American adults who own a cell phone keep on their person a

digital record of nearly every aspect of their lives—from the mundane to the intimate.' " *Id.* (quoting *Riley*, 573 U.S. at 395). The court went on to hold that, even if it had concluded that the search warrant was not supported by a substantial basis for its issuance, it would not require exclusion, because the police acted in good faith under *Leon*, 468 U.S. 897. *Stevenson*, 168 A.3d at 978-80.

¶ 119   I now turn to the cases that discuss the issue of whether probable cause that a suspect has molested a child or children, in and of itself, also establishes probable cause (nexus) to search for child pornography. There is disagreement among federal circuit courts as to whether evidence of child molestation creates probable cause for a search warrant for child pornography. In *United States v. Colbert*, 605 F.3d 573, 578 (8th Cir. 2010), the Eighth Circuit held that there is "an intuitive relationship between acts such as child molestation or enticement and possession of child pornography." The *Colbert* court also discussed its disagreement with other circuits that have suggested that evidence of a "defendant's tendency to sexually abuse or exploit children is irrelevant to the probable cause analysis." *Id.* I agree with the Eighth Circuit in *Colbert*, as its analysis is in line with both the United States Supreme Court's, as well as our supreme court's recognition that child pornography " 'is often associated with child abuse and exploitation, resulting in physical and psychological harm to the child.' " *People v. Hollins*, 2012 IL 112754, ¶ 21 (quoting *State v. Senters*, 699 N.W.2d 810, 817 (Neb. 2005)). Our supreme court has repeatedly "noted that child pornography is intrinsically related to child sexual abuse and states have a compelling interest in safeguarding the physical and psychological health of children." *Id.* ¶ 18 (citing *New York v. Ferber*, 458 U.S. 747, 756-59 (1982), and *People v. Alexander*, 204 Ill. 472, 477 (2003)). The "intrinsic" relationship between child molestation and child pornography

recognized in cases involving first amendment challenges to child pornography statutes cannot be brushed aside when evaluating fourth amendment challenges to search warrants.

¶ 120 The facts in *Colbert* are as follows. On June 7, 2006, police responded to a park to investigate a suspicious interaction between Colbert and a five-year-old girl. The child's uncle witnessed Colbert pushing the child on a swing and talking about movies and videos he had in his home. The detective got a description of Colbert's vehicle, which was subsequently stopped by two patrol officers. Colbert consented to a search of his vehicle, where police found "a police scanner, handcuffs, and a hat bearing the phrase 'New York PD.' " *Colbert*, 605 F.3d at 575. Colbert explained that he had been employed as a security guard four years earlier. He admitted speaking to the child about movies he had at his apartment. Colbert was taken to the police station for questioning. A search warrant application was drafted "seeking permission to search Colbert's residence for books, photos, videos, and other electronic media depicting 'minors engaged in a prohibited sexual act or in the simulation of a prohibited sexual act.' " *Id.* The warrant described Colbert's interaction with the child where he told her " 'his apartment had movies and videos she would like to watch and other things for her to do.' " *Id.* The warrant described defendant's vehicle as resembling a police vehicle. *Id.* at 575-76. The search of Colbert's apartment "resulted in the discovery of a number of children's movies, a computer, and numerous compact discs containing child pornography." *Id.* at 576. Colbert was charged with possession of child pornography. After his motion to suppress was denied, Colbert entered a conditional plea and was sentenced to 120 months' in prison. On appeal, Colbert argued that the affidavit was "conclusory in nature, failing to specify the source of the information that it contained." *Id.* Relying on *Gates*, Colbert argued that such an affidavit could not establish probable cause. *Id.* The court recognized that, although the affidavit was not a "model of detailed police work," it set forth "specific facts and explain[ed]

the investigation that took place." *Id.* The court rejected Colbert's argument that the affidavit was "too conclusory," citing *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007). *Colbert*, 605 F.3d at 576.

¶ 121   Next, Colbert argued that the affidavit did not establish "a link between the evidence of enticement at the park and child pornography in his home." *Id.* The court noted that the evidence from the park demonstrated that Colbert "attempted to lure a five-year-old to his apartment." His vehicle and clothing made him look like "a police officer, suggesting that he was attempting to appear as an authority figure," and he also "possessed handcuffs and a pair of binoculars." *Id.* at 577. These facts "could reasonably give rise to the inference that he was surveilling the area, looking for opportune targets. For no apparent reason, Colbert approached a five-year-old girl and spoke to her for approximately forty minutes," and he attempted to convince her to come to his apartment, where he had "movies for her to watch and other things for her to do." *Id.* The court quoted the district court's reasoning that " 'individuals sexually interested in children frequently utilize child pornography to reduce the inhibitions of their victims.' " *Id.* The court agreed that "sexual depictions of minors could be logically related to the crime of child enticement, particularly under the facts of this case, in which Colbert had referred to movies and videos that he wanted the child to view at his apartment." *Id.* at 577.

¶ 122   The Eighth Circuit recognized that the Sixth Circuit's opinion in *United States. v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008), held that "a search for child pornography was not supported by probable cause where the affidavit was based on the defendant's online confession to an undercover officer that he had an attraction to children and had sexually molested a seven-year-old boy." *Colbert*, 605 F.3d at 57. In *Hodson*, the Sixth Circuit noted the "lack of expert testimony in the affidavit about the relationship between molestation and child pornography." *Id.* The court

also recognized that a divided panel of the Second Circuit reached a similar conclusion in *United States v. Falso*, 544 F.3d 110, 124 (2d Cir. 2008). In *Falso*, the Second Circuit said that the offenses of child pornography and child abuse "are separate offenses and *** nothing in the affidavit draws a correlation between a person's propensity to commit both types of crimes." *Id.* at 123.

¶ 123 The *Colbert* court distinguished *Hodson* and *Falso*, stating that they "are factually inapposite. Neither case involved an application for a search warrant based on the defendant's contemporaneous attempt to entice a child." *Colbert*, 605 F.3d at 577. The court noted that, in *Falso*, the defendant's prior sexual abuse occurred some 18 years prior. *Id.* at 577-78 (citing *Falso*, 544 F.3d at 114). The court also noted that "neither case involved an application to search the exact location of the relevant sex crime." *Id.* at 578. In *Colbert*, the warrant was executed the same day as the enticement at the park and at the "very place" where Colbert wanted to be alone with a five-year-old girl. *Id.* The court went on to comment that, "to the extent that *Hodson* and *Falso* suggest that evidence of a defendant's tendency to sexually abuse or exploit children is irrelevant to the probable cause analysis, we respectfully disagree." *Id.* The court observed that the analysis in *Hodson* and *Falso*, in concluding that there is a "categorical distinction between possession of child pornography and other types of sexual exploitation of children," "seems to be in tension with both common experience and a fluid, non-technical conception of probable cause." *Id.* The court noted that "[c]hild pornography is in many cases simply an electronic record of child molestation." *Id.* The court said that,

> "[f]or individuals seeking to obtain sexual gratification by abusing children, possession of child pornography may very well be a logical precursor to physical interaction with a child: the relative ease with which child pornography may be obtained on the internet might make it a simpler and less detectable way of satisfying pedophilic desires." *Id.* at 578.

The court concluded that, while there "were ways in which the affidavit could have been strengthened," the affidavit nevertheless linked the enticement and the possession of child pornography. *Id.* at 579. The court also commented that its task was not to "criticize the affidavit for what it did not contain but to determine, under a commonsense, nontechnical analysis that gives due deference to the initial judgment of the issuing magistrate, whether what it did contain established probable cause to search for that which it described." *Id.*

¶ 124   The Eight Circuit's decision in *Colbert* has been subject to criticism. See Emily Weissler, *Head Versus Heart: Applying Empirical Evidence About the Connection Between Child Pornography and Child Molestation to Probable Cause Analyses*, 82 Fordham L. Rev. 1487 (2013). The author criticizes the *Colbert* court for using evidence "from court opinions, not empirical data," when concluding that "[t]here is an intuitive relationship between acts such as child molestation or enticement and possession of child pornography." (Internal quotation marks omitted.) *Id.* at 1523. The author argues that, "[a]lthough police officers may have extensive experience with investigating and then helping prosecute child sex offenders, they are not unbiased," and, she continues, it is "in their interest to argue in favor of a connection between the two behaviors because it will help them establish probable cause in scenarios where they may not otherwise be able to obtain a search warrant." *Id.* at 1527. However, the author then correctly concludes that courts should balance "past child molestation or enticement evidence" in their " 'totality of the circumstances' probable cause analysis." *Id.* That is precisely what the *Colbert* court did in affirming the probable-cause determination. I also note that among the cases relied upon by the *Colbert* court was *Osborne v. Ohio*, 495 U.S. 103, 111 (1990) ("evidence suggests that pedophiles use child pornography to seduce other children into sexual activity").

¶ 125   The Seventh Circuit recognized the correlation between possession of child pornography and child molestation in *United States v. Clark*, 668 F.3d 934 (7th Cir. 2012). For a period during 2008-09, Clark lived with his brother and sister-in-law until they asked him to leave, "taking issue with his drinking habits and frequent viewing of pornography on the computer." *Id.* at 935-36. In April 2010, Clark was investigated for breaking into his brother and sister-in-law's home and sexually assaulting his four-year-old niece. The investigation also led to information that Clark had shown pornography on a computer to a six-year-old while living with his brother. There was also evidence that Clark had touched a nine-year-old boy's penis. A detective from the Madison County Sheriff's Office "swore out an affidavit to procure a warrant to search for evidence of aggravated criminal sexual assault and child pornography" at Clark's home and "any computer equipment located at that address; and his laptop computer, which had been seized from his workplace." *Id.* at 937. The detective provided his background and training. The affidavit also contained "general language about individuals associated with child pornography." *Id.* The search of Clark's home yielded two computers and other items. A second search warrant was obtained to authorize the search of the computers and hard drives, which led to incriminating evidence of child pornography. *Id.* at 938.

¶ 126   Clark filed a motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), to contest the detective's affidavits. Clark claimed that the detective "improperly connected his alleged sexual assault on his niece to possession of child pornography through boilerplate language, lacking any specific basis for suspecting him of possession." *Clark*, 668 F.3d at 938. He also claimed that the alleged sexual assault of his niece "provided an insufficient nexus" to authorize the search of his home. The district court granted the *Franks* hearing and found no

material omissions. The district court also rejected Clark's insufficient-nexus argument and denied Clark's motion to suppress. *Id.* at 938-39.

¶ 127   Clark argued on appeal, like defendant in the instant case, that "his alleged sexual assault of his niece did not support probable cause that he possessed child pornography." *Id.* at 939. He also argued that whatever probable cause existed "justified only a search of his brother's home, not his." *Id.* The circuit court rejected these arguments, stating that,

> "[i]n short, the affidavit documents *** Clark's particular, sexual attraction to children and his willingness to act on his proclivities. The affidavit thus places him at the heart of the boilerplate language to which he objects: as an individual associated with sex offenses involving minors, he likely 'collect[ed] and/or view[ed] images on the computer.' " *Id.* at 940.

¶ 128   In *United States v. Houston*, 754 F. Supp. 2d 1059 (D.S.D. 2010), Houston moved to suppress evidence of child pornography recovered from his computer. The affidavit in support of the search warrant included statements of Houston's 12-year-old niece that, when she was 4 or 5 years old, Houston had sexual contact with her on at least two occasions. Houston acknowledged that contact in a 2009 e-mail. The girl also stated that when she was five and six years old, she saw Houston looking at " 'naked boys' and girls' butts' " on her family's computer. *Id.* at 1062. The court followed *Colbert* in denying Houston's motion to suppress, stating, "[i]t would seem that the intuitive relationship between known child molestation and possessing child pornography would be stronger than the inverse, the inverse being the relationship between possessing child pornography and the possibility of subsequently molesting a child." *Id.* at 1064.

¶ 129   In *United States v. Brand*, 467 F.3d 179 (2nd Cir. 2006), Brand was convicted of traveling in interstate commerce for the purposes of engaging in illicit sexual conduct (sex with a minor)

and of using a facility of interstate commerce (a computer) to entice a minor to engage in illicit sexual activity. Brand was arrested after he engaged in internet chats with FBI agents posing as young girls. The chats led to undercover telephone conversations with a private citizen posing as "Julie," an underage girl. During the phone calls, Brand discussed the sexual acts he could engage in with Julie. *Id.* at 185-86. Brand was arrested after he arrived at the destination to meet with Julie. Brand admitted to the communications with Julie, but he said that he had changed his mind the night before the scheduled meeting. He said that he had e-mailed Julie to give her a way out. *Id.* at 186. Brand also admitted that he received and viewed child pornography on his computer.

¶ 130 At trial, Brand asserted the entrapment defense. The government argued in a pretrial motion that the images of child pornography recovered from Brand's computer were "admissible as direct evidence of the crimes charged." *Id.* at 187. Alternatively, the government argued that the images were admissible under Federal Rule of Evidence 404(b) to prove "motive, intent, plan, knowledge, and absence of mistake or accident." *Id.* The trial court ruled that the images were not admissible as direct evidence but were admissible under Rule 404(b).

¶ 131 On appeal, Brand argued that the trial court erred in allowing the government to introduce the images of child pornography. He argued that possession of child pornography is not sufficiently similar to the charged crimes to make the images admissible under Rule 404(b). *Id.* at 195-97. The Second Circuit rejected Brand's argument, stating that "[t]he 'similarity or some connection' requirement is satisfied in the instant case because a direct connection exists between child pornography and pedophilia." *Id.* at 197. The court cited *United States v. Byrd*, 31 F.3d 1329, 1336 n.9 (5th Cir. 1994), which also recognized the link between child pornography and pedophilia. *Brand*, 467 F.3d at 197. The court agreed with the *Byrd* court's conclusion that the offenses of possessing child pornography and child molestation are linked by an " 'abnormal sexual attraction

to children.' " *Id.* at 198 (quoting *Byrd*, 31 F.3d at 1336 n.9). The court went on to state that, "[i]n addition to indicating a broader abnormal sexual attraction to children, child pornography shares a strong nexus with pedophilia." *Id.* " '[C]hild pornography may induce viewers to commit sex crimes on children.' " *Id.* (quoting *Byrd*, 31 F.3d at 1336 n.9). The court noted that, "[i]n the Child Pornography Prevention Act of 1996, Congress found that 'child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children.' " *Id.* (quoting Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996)). The court stated that a "reasonable juror could conclude that Brand was whetting his own sexual appetite for his encounter with 'Julie.' " *Id.* at 199. Likewise, in the instant case, a reasonable police officer or issuing judge could have inferred that defendant might have viewed child pornography to whet his sexual appetite before abducting M.G. and might have also recorded the sexual act on his cell phone.

¶ 132   In *State v. Ball*, 53 A.3d 603 (N.H. 2012), Ball was convicted of possession of child pornography recovered from his computer pursuant to a search warrant. The affidavit contained a hearsay statement from the stepdaughter of one of Ball's friends stating that Ball "joined her and Johnston on the bed and masturbated while he watched them have sex." *Id.* at 605. Ball filed a motion to suppress, arguing that the warrant affidavit did not set forth any probable cause to link any child pornography to his computer. The New Hampshire Supreme Court rejected this argument, citing *Colbert*. *Id.* at 608. The court noted that there was evidence of child molestation and the fact that Ball watched and masturbated was evidence that he "was a voyeur of child sexual activity." *Id.*

¶ 133   *State v. Johnson*, 372 S.W.3d 549 (Mo. Ct. App. 2012), is also instructive. There, while on a trip to watch the state basketball championship in Missouri, Johnson stayed in a motel room with

three young boys. One of the boys woke up to find Johnson rubbing the boy's penis. Based on the events in the hotel room, the police obtained a search warrant for Johnson's home, stating that the affiant believed that evidence of the offense of possession of child pornography would be found there. The affidavit stated that Johnson had his laptop computer on the trip. The affiant also listed his experience. Johnson moved to suppress the evidence seized from his computer. The trial court denied the motion. On appeal, Johnson argued that there was no " 'correlation between the alleged crime against a child and the possession of child pornography.' " The Court of Appeals of Missouri disagreed, noting that Johnson had "access to his camera and computer" on the trip and he slept in the same bed as the victim. Also, the victim "was showering and presumably changing clothes in the hotel room." *Id.* at 555. The court found the reasoning in *Colbert* "persuasive and relevant to the facts of this case." *Id.*

¶ 134   In *State v. Grenning*, 174 P.3d 706 (Wash. Ct. App. 2008), a woman called the police department saying that she was concerned that Grenning had sexually molested her five-year-old son. In the affidavit in support of the search warrant, the detective indicated that the child's mother found him in the bathroom placing an object in his anus. The victim told his mother that he was " 'trying to get out what [Grenning] had put into [his] butt.' " *Id.* at 710. The victim also told his mother that Grenning put petroleum jelly on his "pee pee," as he handed her the jar. The mother told the police that Grenning had shown her a digital photo he took of the victim while he was unclothed. During Grenning's police interview, he told the detective that he kept personal lubricant next to his computer, saying that " 'it was more enjoyable to do that while sitting at the computer.' " *Id.* When asked if he had any pornographic material on his personal computer, Grenning admitted that he might have some " 'old stuff' " on it. *Id.* Grenning was the victim's neighbor and occasionally took care of him. *Id.* at 525. During the search of Grenning's computer,

the police located two images of commercial child pornography. A second search warrant was obtained, expanding the search to include "photographs, photograph albums, and drawings depicting minors engaged in sexually explicit activity." *Id.* at 527. The second warrant was not executed until more than a year after it was issued. The police recovered 35,000 to 40,000 images of child pornography on Grenning's computer. *Id.* Grenning's motion to suppress was denied, and he was convicted by a jury of 16 counts of first-degree child rape along with multiple related charges, including possession of child pornography. *Id.* at 529.

¶ 135 On appeal, Grenning argued that there was no probable cause for the issuance of the first warrant, because the affidavit cited only "noncriminal behavior together with general statements about pedophile's [*sic*] habits." The court of appeals disagreed, stating that the "affidavit specifie[d] facts about Grenning's molestation" of the victim. *Id.* at 714. The court concluded that there was a reasonable inference from the affidavit that "Grenning sexually molested [the victim], that he masturbated in front of his computer, and that there were sexually explicit photographs on Grenning's computer supporting a child molestation charge." *Id.* at 715. The court held that probable cause existed and that the search was sufficiently particularized. *Id.*

¶ 136 As noted earlier, the United States Supreme Court and our supreme court have repeatedly recognized the intrinsic relationship between child molestation and child pornography. Our legislature has recognized the nexus between child molestation and child pornography. The Code of Criminal Procedure of 1963 provides that, in a case in which a defendant is accused of "predatory criminal sexual assault of a child" or "child pornography," evidence of the commission of one of the offenses is evidence that he or she committed the other offense. 725 ILCS 5/115-7.3 (West 2012). In *People v. Donoho*, 204 Ill. 2d 159, 176 (2003), our supreme court held that such evidence is admissible on any matter to which it is relevant, including propensity. The court noted

that several other states have broadened the exceptions to the ban on other-crimes evidence, some allowing "such evidence to show lustful disposition or tendency toward sexual predation." *Id.* at 175. As our supreme court recognized in *Donoho*, child molestation cases rely on child victims' credibility, which can be attacked in the absence of substantial corroboration. There "is a compelling public interest in admitting all significant evidence that will shed some light on the credibility of the charge and any denial by the defense." 140 Cong. Rec. S12990-01 (daily ed. Sept. 20, 1994) (statement of Sen. Dole) (cited with approval in *United States v. Sumner*, 119 F.3d 658, 662 (8th Cir. 1997)). It must be remembered that, for a court to have the opportunity to rule on the admissibility of evidence, the police must have an opportunity to find it. In this case, the police sought and obtained a search warrant to look for evidence to corroborate an act of depravity the likes of which the trial court had never seen before. At the time of the search, the police were not certain who molested M.G. or what had caused the injury to M.G.'s vagina. Defendant had the option of abducting a three-year-old, a five-year-old, or a nine-year-old. He selected the victim least likely to be able to recount the defendant's attack. Now, to make his case, he relies on the absence of any witness to say that he possessed or used a cell phone. We should reject this argument. In *Riley*, the Supreme Court did not create any special barriers to block law enforcement access to cell phones. They merely concluded that, because cell phones contain private and often intimate information, police must "get a warrant." *Riley*, 573 U.S. at 403. Nothing is more private or intimate than the molestation of a child, and a cell phone or a computer is the most likely place to find evidence to corroborate the victim's account. In my view, considering the totality of the facts and circumstances set forth in Hergott's affidavit, along with the commonsense inferences that arise from those facts, it was reasonable to conclude that evidence of the offenses listed in the warrant would be found in defendant's cell phone, in particular, the photo and video files.

¶ 137   Likewise, there was a sufficient nexus between the offenses under investigation and the texts and e-mails stored in defendant's cell phone. Police officers trained in child molestation crimes are keenly aware of the devastating harm, both physical and psychological, such crimes cause to the victims. See *People v. Huddleston*, 212 Ill. 2d 107, 134-37 (2004). They also know that "[m]ost cases never come to the attention of law enforcement or treatment professionals." *Id.* at 137. Citing numerous studies, our supreme court stated that "[s]ome experts estimate that less than one-third of all sexual abuse and assault cases are actually reported and investigated by child protective authorities." *Id.* The rate of recidivism among child molesters is frighteningly high and might be as high as 80% for those who have not undergone treatment. *McKune v. Lile*, 536 U.S. 24, 33 (2002). In *Huddleston*, our supreme court stated that the "incidence of child molestation is a matter of grave concern in this state and others, as is the rate of recidivism among the offenders." *Huddleston*, 212 Ill. 2d at 137.

¶ 138   Hergott, who was trained in child sexual abuse and computer crimes involving children, was obviously aware of this "grave concern." We also presume that Judge Collins was aware of *Huddleston*. See *People v. Weston*, 271 Ill. App. 3d 604, 615 (1995) (circuit court is presumed to know the law and apply it properly). Trial and reviewing courts may take judicial notice of supreme court as well as appellate court decisions. See *People v. Thomas*, 137 Ill. 2d 500, 517-18 (1990).

¶ 139   *People v. Taggart*, 233 Ill. App. 3d 530 (1992), is also instructive. On February 6, 1987, Elmhurst police seized photographs and index cards from Taggart's van during a consent search. The photographs depicted young nude boys. Taggart explained that the photographs were of boys who attended his camp and the index cards contained their names and addresses. He was released without charges, but the police refused to return the photographs and the index cards.

¶ 140    The police did not believe Taggart's explanation for the materials. They believed he might be a child molester. The police first encountered Taggart at 12:19 a.m., and he was parked in a parking lot with a young boy. Taggart told the police that he was teaching the boy how to drive for his birthday. The boy provided a different story and denied that Taggart was giving him driving lessons. He told the police that he and Taggart were going to spend the night at a friend's house, but he was unable to provide the friend's name or address. *Id.* at 534-37. Although the boy's parents verified that he had permission to spend the night with Taggart, the police continued to investigate. On February 16, 1987, Taggart returned to the Elmhurst Police Department to retrieve the material seized from his van. When a detective told him that the police were going to interview some of the boys who attended his camp, Taggart became upset and claimed that "it would ruin his reputation and put him out of business." *Id.* at 544. Taggart was eventually charged with several counts of aggravated criminal sexual assault involving two victims.

¶ 141    The trial court granted in part and denied in part Taggart's motion to suppress the evidence seized from his van. The trial court ruled that the police had probable cause to seize the photographs and the index cards during the consent search of the van. The court noted that the second search, at the police station, was involuntary and included two books recovered from under the mattress in Taggart's van. The books contained pornographic literature about adult men having sex with young boys.

¶ 142    On appeal, Taggart argued that, at the time of the seizure, there was no nexus between the photographs and index cards and the criminal behavior. *Id.* at 554. This court held that there was probable cause to seize the materials because "they constituted evidence of crime or were likely to lead to further evidence." *Id.* at 555. I view the seizure of the index cards in *Taggart* as being analogous to searching the text messages and e-mails stored in defendant's cell phone. As the facts

in *Taggart* demonstrate, the index cards led the police to other victims. It is a matter of common knowledge that cell phones and computers are commonly used to produce, store, share, and view child pornography. It is also a matter of common knowledge that many, if not most, child molesters view and use child pornography before and during the abuse. The United States Department of Justice's "The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress" stated in 2010 that "[a] number of studies indicate a strong correlation between child pornography offenses and contact sex offenses against children." U.S. Dep't of Justice, The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress 19 (Aug. 2010), https://www.justice.gov/psc/docs/natstrategyreport.pdf [https://perma.cc/5ERG-FQMC]. "[E]asy access to Internet child pornography has fueled a market for such material, and has enhanced the link between child pornography and the facilitation of other crimes against children such as molestation." Stephen T. Fairchild, *Protecting the Least of These: A New Approach to Child Pornography Pandering Provisions*, 57 Duke L. J. 163, 165 (2007). There has been a "historic rise in the distribution of child pornography, in the number of images being shared online, and in the level of violence associated with child exploitation and sexual abuse crimes. Tragically, the only place we've seen a decrease is in the age of victims." Attorney General Eric H. Holder, Jr., Speech at the National Strategy Conference on Combating Child Exploitation (May 19, 2011) (transcript available at https://www.justice.gov/opa/speech/attorney-general-eric-holder-speaks-national-strategy-conference-combating-child [https://perma.cc/7RCV-EEQA]).

¶ 143    There appears to be an assumption on the part of defendant that offenders who possess child pornography and those who molest children are dichotomous groups. Our own cases, such as *Taggart*, should tell us that this assumption has no foundation in reality. In each of these cases, investigations into acts of child molestation led to the discovery of child pornography. Discovering

child pornography while conducting child-molestation investigations is not rare. The production of child pornography has grown substantially since the beginning of the digital age. In 2010, 74% of those convicted in federal courts of producing child pornography were physically present with their victims or, if not, were aided or abetted by others. U.S. Sentencing Comm'n, Federal Child Pornography Offenses 263 (2012), https://www.ussc.gov/sites/default/files/pdf/news/ congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography- offenses/Full_Report_to_Congress.pdf [https://perma.cc/L2BE-K64E]. The Justice Department reported to Congress in 2010 that, during the "Global Symposium for Examining the Relationship Between Online and Offline Offenses and Preventing the Sexual Exploitation of Children," experts from around the world met in 2009 to develop points of consensus. U.S. Dep't of Justice, *supra*, at 19. "Among the most notable points of consensus developed include a finding that there is sufficient evidence of a relationship between possession of child pornography and the commission of contact offenses against children to make a cause of acute concern, and that the greater availability of child sexual exploitation materials has stimulated the demand and production of even more extreme, sadistic, and violent images of children and infants." *Id.*

¶ 144    The majority notes (*supra* ¶ 23) that the warrant did not "exclude any file locations to be searched." I submit that this was due to the nature of the offenses. Even critics of broad scope search warrants for cell phones in the post-*Riley* era recognize that

> "[i]n some cases, this broad language may actually be acceptable. For instance, if police
> are searching for child pornography that could be hidden anywhere, it is arguably the case,
> depending on the sophistication of the forensic software, that the officers may need to
> review 'all data' to find evidence the suspect has purposefully mislabeled or hidden deep

within the phone." Adam M. Gershowitz, *The Post-Riley Search Warrant: Search Protocols and Particularity in Cell Phone Searches*, 69 Vand. L. Rev. 588, 601. In this case, as defendant conceded at oral argument, several questions raised by the factual details in the complaint could be answered by the contents of defendant's cell phone.

¶ 145   In my opinion, given the facts set forth in the complaint, common knowledge regarding the behavior of child molesters, together with the commonsense inferences, the broad scope approved by Judge Collins, especially regarding the video files in defendant's cell phone, was supported by probable cause.

---

**No. 2-17-0379**

---

| | |
|---|---|
| **Cite as:** | *People v. Reyes*, 2020 IL App (2d) 170379 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 13-CF-2843; the Hon. Mark L. Levitt, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Andrew Smith, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Steven A. Rodgers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---